722 F.2d 1019
 14 Fed. R. Evid. Serv. 1279
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jose CALVENTE, Ramon Molina-Santiago, Jose Martinez-Torres,
Arturo Alamo, Nancy Medina, Ramon Santiago-Colon, Iris Norma
Rodriguez, Nelson Soto, Georgina Rodrigues-Vargas, and Pablo
Rodriguez, Defendants-Appellants.
 Nos. 1540, 1571, 1541, 1572, 1573, 1574, 1582, 1575, 1576,
1542, Dockets 83-1035, 83-1036, 83-1041, 83-1042,
83-1053, 83-1057, 83-1058, 83-1062,
83-1079, 83-1098.
 United States Court of Appeals,
Second Circuit.
 Argued July 13, 1983.
Decided Nov. 15, 1983.
 
 Hermena Perlmutter, New York City, for defendant-appellant Calvente.
 Irving Cohen, New York City, for defendant-appellant Molina-Santiago.
 Martin I. Saperstein, Mineola, N.Y. (Michael L. Cirrito, White & Cirrito, Mineola, N.Y., on the brief), for defendants-appellants Martinez-Torres and Medina.
 Paul E. Warburgh, Jr., Axelrod & Warburgh, New York City, for defendant-appellant Alamo.
 Michael P. Stokamer, New York City, for defendant-appellant Santiago-Colon.
 Eric Greenbush, New York City, for defendant-appellant Iris Norma Rodriguez.
 Philip R. Edelbaum, New York City, for defendant-appellant Soto.
 James Moriarty, New York City, for defendant-appellant Rodrigues-Vargas.
 C. Joseph Halligan, New York City, for defendant-appellant Pablo Rodriguez.
 James R. Devita, Asst. U.S. Atty., S.D.N.Y., New York City (Rudolph Giuliani, U.S. Atty., Gerard E. Lynch, Asst. U.S. Atty., New York City, on the brief), for plaintiff-appellee.
 Before NEWMAN and WINTER, Circuit Judges, and MALETZ, Judge.*
 WINTER, Circuit Judge:
 
 
 1
 Jose Calvente, Ramon Molina-Santiago, Jose Martinez-Torres, Arturo Alamo, Nancy Medina, Ramon Santiago-Colon, Iris Norma Rodriguez, Nelson Soto, Georgina Rodrigues-Vargas, and Pablo Rodriguez appeal from judgments of conviction in the United States District Court for the Southern District of New York following a three-week trial before Chief Judge Motley and a jury.
 
 
 2
 The ten defendants were convicted of twelve counts of violating the federal narcotics laws and laws relating to possession and use of firearms.[1] Numerous claims of error are raised, all but two of which clearly lack merit. One claim involves the constitutional validity of a consent to search, the other, the denial by Chief Judge Motley of a motion to strike a witness' testimony.
 
 
 3
 We affirm.
 
 BACKGROUND
 
 4
 We view the evidence in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Defendant Jose Martinez-Torres headed a major, wholesale narcotics organization centered in the Bronx, which sold almost $1.3 million worth of heroin and cocaine in the first six months of 1982, utilizing the names of "La Tunba" for heroin and "Nice" for cocaine. The primary base of operations was a cutting mill, or narcotics factory, located at 2526 Bronx Park East. Martinez-Torres' largest wholesale distributor was Arturo Alamo, who received on consignment some $460,000 worth of narcotics during the first six months of 1982. Nancy Medina, Martinez-Torres' common-law wife, assisted him in running his narcotics business and in maintaining records. Jose Calvente acted as a courier and made deliveries to wholesale distributors.
 
 
 5
 A government informant, Cologero Luigi Vizzini, infiltrated Martinez-Torres' organization with the unwitting assistance of Jaime Vila, a convicted narcotics dealer, who befriended Vizzini in 1979 when both were in prison and enabled him to gain the trust of Martinez-Torres and more important, access to the Bronx apartment. During his first visit to the apartment, Vizzini saw brown paper bags on a living room table filled with bundles of small cellophane or glassine bags with the name "La Tunba" stamped on them. He also saw amounts of money on the table and a number of weapons lying around the apartment.
 
 
 6
 During subsequent visits to the apartment, Vizzini saw all the defendants, except Medina and Alamo, participate in the cutting and bagging of narcotics. He saw Alamo pick up narcotics for street distribution on a consignment basis and return subsequently with money and leftover drugs. Finally, Vizzini witnessed large financial transactions all of which were recorded in ledger books by Martinez-Torres and Medina.
 
 
 7
 On June 28, 1982, Vizzini introduced undercover Drug Enforcement Administration ("DEA") agent Frank Marrero into the narcotics organization and Martinez-Torres invited Marrero to the cutting mill. Marrero was taken into the bedroom which contained a marble table used for cutting drugs. While in the room, Marrero saw four or five automatic weapons, bundles of glassine envelopes wrapped with rubber bands, scales and plastic bags. During the course of his visit, he met Soto, Santiago-Colon, Medina and Pablo Rodriguez.
 
 
 8
 On July 1 at approximately 10:00 p.m., Vizzini informed the chief DEA agent, Frederick Marano, that a shipment of heroin had been received at the apartment for processing. He decided to act immediately.
 
 
 9
 At 11:15 p.m., DEA agents observed Molina-Santiago and Santiago-Colon leaving the Bronx building with a brown paper bag. These individuals were arrested within the hour as they were driving out of the neighborhood and were taken to a McDonald's parking lot. Shortly thereafter, the DEA agents observed Martinez-Torres and Vizzini leave the building. They too were apprehended after a high speed chase through the Bronx during which two loaded handguns were thrown out of the car. Martinez-Torres and Vizzini were also taken to the McDonald's lot.
 
 
 10
 Agent Marano testified that he then read Martinez-Torres his rights and that the following conversation ensued:
 
 
 11
 I said ... that my name was Marano and I was a federal agent; that I had been investigating the heroin activity at 2526 Bronx Park East, Apartment 5B; that I knew that there were machine guns and weapons in the apartment; that I knew that there was heroin in the apartment; and that I was going to enter the apartment that evening.
 
 
 12
 I said to him that I was concerned about entering the apartment, because I knew that there were children and females in the apartment, but inasmuch as I knew that there were heavy weapons, dangerous weapons in the apartment, I was concerned for everyone's safety. I asked that he assist me in entering the apartment by letting me in peacefully.
 
 
 13
 Martinez-Torres consented to the entry on the condition that the DEA agents not harm his wife and child. The agents thereafter took Martinez-Torres to the apartment where Martinez-Torres kicked the door and shouted in Spanish to his wife inside, "Nancy, I've been arrested. Throw everything out." At that point Marano asked Martinez-Torres to let the agents into the apartment. Martinez-Torres motioned to his key ring and indicated the key to the apartment. Marano opened the lock and entered the apartment.
 
 
 14
 Upon entering, the agents placed Medina, Rodrigues-Vargas and Iris Rodriguez under arrest. They promptly engaged in a security check or protective sweep to see if anyone else was on the premises. While doing this, they noticed an open brown paper bag on the kitchen table and looked inside it. The bag contained a small quantity of heroin and $2,400. In the bedroom, DEA agents saw the marble cutting table, several boxes of ammunition, a scale for measuring narcotics and large glass jars with white powder. Next to the cabinet near the door to the bedroom were three large packing boxes filled with thousands of glassine bags stamped with the names "La Tunba" and "Nice."
 
 
 15
 Upon completion of the security check, the agents sought a search warrant over the telephone. While they were waiting for the warrant, Arturo Alamo arrived, and the DEA agents placed him under arrest. The warrant was obtained shortly thereafter and, the agents began to search the apartment. They seized $6,900 in cash, large quantities of narcotics, chemicals used to dilute drugs, narcotics cutting and packaging paraphernalia, and detailed and explicit ledgers of narcotics transactions in Martinez-Torres' and Medina's handwriting. They also seized an arsenal of heavy weapons including a .45 caliber machine gun equipped with a silencer. Other documents found in the apartment established links among all the defendants.
 
 
 16
 On the afternoon of July 2, 1982, the DEA agents obtained a warrant to search Martinez-Torres' and Medina's home at 774 East 236th Street. In that apartment they found another ledger book and additional illegal firearms.
 
 DISCUSSION
 1. Consent
 
 17
 Martinez-Torres and Medina argue that the evidence seized at the cutting mill and the 236th Street apartment should have been suppressed since Martinez-Torres' consent to the police entering the cutting mill was not freely and voluntarily given. They argue that the agents' initial entry into the cutting mill violated their Fourth Amendment rights, and, therefore, that the agents' plain view observations cannot support the subsequent search warrant. Similarly, they argue that the warrant for the search of the 236th Street apartment was also based on the fruits of the illegal entry.
 
 
 18
 Chief Judge Motley rejected these arguments in a lengthy opinion following a two day hearing. United States v. Martinez-Torres, 556 F.Supp. 1236 (S.D.N.Y.1982). She held that the initial entry into the mill was permissible because Martinez-Torres voluntarily consented to it, and, in the alternative, because it was justified by exigent circumstances. Id. at 1250-53. Because we agree with her conclusion as to consent, we find it unnecessary to reach the question of exigent circumstances.
 
 
 19
 A warrantless search or entry to secure the premises is constitutional if conducted pursuant to the valid consent of a person in control of the premises. See generally Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The government has the burden of proving consent voluntarily given by a preponderance of the evidence. Bumper v. North Carolina, 391 U.S. 543, 548-49, 88 S.Ct. 1788, 1791-92, 20 L.Ed.2d 797 (1968) in light of "the totality of the surrounding circumstances," Schneckloth v. Bustamonte, supra, 412 U.S. at 226, 93 S.Ct. at 2047.
 
 
 20
 The district court's findings, supported by the record, are that Martinez-Torres was capable of giving a voluntary consent. He is forty years old and has a sufficient understanding of English. He has been convicted on two previous occasions and is thus no "newcomer to the law," United States v. Watson, 423 U.S. 411, 424-25, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). He was resigned and calm during his conversation with Marano, United States v. Sanchez, 635 F.2d 47, 60 (2d Cir.1980) and the tenor of the discussion was conversational. United States v. Price, 599 F.2d 494, 503 (2d Cir.1979).
 
 
 21
 Agent Marano told Martinez-Torres that he could obtain a warrant. This statement, clearly true in light of the ample evidence of illegal activity, does not vitiate the consent since advising a person of the fact that a search warrant can be obtained does not constitute coercion. United States v. Faruolo, 506 F.2d 490, 495 (2d Cir.1974); United States v. Lace, 669 F.2d 46, 52 (2d Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982).
 
 
 22
 The defendants argue, however, that it is coercive for agents to seek consent to enter an apartment by stating a desire to avoid an armed confrontation. We disagree. It is hardly in the interests of occupants of such dwellings that gunbattles erupt, a possibility made more likely by the alternative suggested by the appellants, namely, forcible entry with a warrant. The presence of weaponry which may be used in a violent confrontation resulting in bloodshed is not the creation of the agents and an occupant's seizing of an opportunity to bring about a peaceful entry is not involuntary under the Fourth Amendment. We perceive, therefore, no constitutional infirmity in the initial entry into the cutting mill. The warrants secured subsequently are thus also clearly valid.
 
 2. Vizzini's Testimony
 
 23
 All appellants claim that it was reversible error for the trial court not to have stricken Vizzini's direct testimony because of two matters.
 
 
 24
 The first incident concerns Vizzini's pretrial statement to an Assistant United States Attorney admitting that he had committed fourteen homicides other than one for which he had been incarcerated. The government made this information known to defense counsel prior to Vizzini's testimony, and also informed them that Vizzini would probably invoke his Fifth Amendment privilege if confronted at trial with questions concerning the homicides. This prediction proved correct as Vizzini initially invoked the privilege in response to such questions. However, before the end of his testimony, he reversed himself and answered all questions, denying that he had been involved in the murders. The government stipulated before the jury that Vizzini had previously claimed to have committed the homicides and Vizzini attributed the apparent inconsistency to a misunderstanding. His denial thus raised a credibility issue for the jury.
 
 
 25
 The appellants now argue that Vizzini should not have been permitted in the first instance to invoke his Fifth Amendment right because his prior statements had waived it. See Klein v. Harris, 667 F.2d 274, 287-88 (2d Cir.1981). Whether he had waived the privilege or not, no prejudice to the appellants resulted since Vizzini was fully cross-examined on the subject of the homicides. Nor did the government knowingly or recklessly allow perjured testimony to stand unimpeached, for it stipulated that he had previously admitted to the murders. Far from being prejudiced by this turn of events, the appellants referred to it repeatedly and used it in their summations to impeach Vizzini's credibility.
 
 
 26
 The second incident which appellants claim compels the striking of Vizzini's testimony was his arrest on November 9, 1982, during the trial, for conspiring to impersonate a DEA agent. Vizzini, his direct and cross-examination as a government witness having been completed, allegedly stole a DEA agent's identification and used it to enter and rob a narcotics dealer's apartment in Queens. Vizzini was then called as a defense witness for further examination. The government refused to grant Vizzini use immunity, and he invoked his Fifth Amendment privilege in response to questions concerning his arrest. Appellants claim that Vizzini's resort to the privilege deprived them of their Sixth Amendment right to cross-examine.
 
 
 27
 Whether Vizzini's assertion of the privilege calls for the striking of his earlier testimony depends upon whether the subject matter involved related to his earlier direct testimony or involved collateral matters going to his credibility. United States v. Cardillo, 316 F.2d 606, 611 (2d Cir.) cert. denied, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963); Dunbar v. Harris, 612 F.2d 690, 692 (2d Cir.1979). Vizzini's arrest on November 9, 1982 for attempting to rob a drug dealer in Queens did not undermine Vizzini's testimony as to the cutting mill by exposing possible errors in narration, weakness in memory or difficulty in perception. It was thus relevant only insofar as it cast light upon his character and his credibility as a witness. In the context of this case, these are important matters to be sure, but the refusal of Vizzini to testify about the circumstances of his arrest did not prevent a full exploration of those events by defendants. The facts concerning Vizzini's arrest were fully explored in the defense's examination of DEA agents. Moreover, Vizzini's original cross-examination, which lasted three days, was replete with testimony of misdeeds, including among other things, prior convictions, parole violations, a psychiatric history and a 1967 sentencing in Brooklyn Supreme Court in which Vizzini was termed an "unreliable nut." As the record stands, all of the harmful facts concerning Vizzini's credibility were before the jury and his invocation of the privilege as to the arrest could only have been helpful to the defense.
 
 
 28
 Appellants also claim that the government's refusal to grant Vizzini use immunity regarding his arrest denied them a fair trial. Their argument is unpersuasive. The Sixth Amendment does not compel immunity for defense witnesses and the Due Process Clause of the Fifth Amendment is not "a general requirement that defense witness immunity must be ordered whenever it seems fair to grant it." United States v. Turkish, 623 F.2d 769, 777 (2d Cir.1980), cert. denied, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); see also United States v. Burns, 684 F.2d 1066, 1077 (2d Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). For us to reverse on these grounds, there must be a showing that (1) the government either has engaged in discriminatory use of immunity to gain tactical advantage or has forced the witness through overreaching to invoke the privilege; (2) the witness' testimony would have been "material, exculpatory and not cumulative; " and (3) the evidence was unobtainable from any other source. Id. We believe that the discussion above amply demonstrates that none of these conditions was met.
 
 3. Other Claims
 
 29
 We have considered the numerous other claims raised by appellants as grounds for reversal and conclude that none has merit.
 
 CONCLUSION
 
 30
 The judgments of conviction as to each of the appellants are affirmed.
 
 
 
 *
 The Honorable Herbert N. Maletz, Judge, United States Court of International Trade, sitting by designation
 
 
 [1]
 All defendants were convicted on Count 1 of conspiracy to distribute, and possession with intent to distribute, heroin and cocaine, in violation of 21 U.S.C. Sec. 846. Jose Martinez-Torres was convicted on Count 2 of running a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848. Martinez-Torres, Arturo Alamo, Ramon Santiago-Colon, Ramon Molina-Santiago, Nancy Medina, Georgina Rodrigues-Vargas and Iris Norma Rodriguez were convicted on Counts 3 and 4 of distribution and possession of heroin and cocaine in violation of 21 U.S.C. Secs. 812, 841(a)(1), 841(b)(1)(A) and 18 U.S.C. Sec. 2. Martinez-Torres, Santiago-Colon, Molina-Santiago, Medina, Calvente, Rodrigues-Vargas, Pablo Rodriguez, Iris Norma Rodriguez and Soto were found guilty on Count 5 of conspiracy to use firearms to commit a federal felony and to possess firearms that were not properly registered or identified by serial number in violation of 18 U.S.C. Sec. 371. Martinez-Torres was convicted on Counts 6, 7 and 8 and Medina convicted on Count 8 of using high caliber automatic pistols, a semi-automatic submachine gun, and a machine gun and silencer, to commit federal felonies in violation of 18 U.S.C. Secs. 924(c) and 2. The jury found Martinez-Torres guilty on Counts 9, 10, 11, and 12 of violating 26 U.S.C. Secs. 5861(d), 5861(i) and 5871 by receiving and possessing a machine gun and a silencer not registered to him and not identified by serial number as required by federal law