**UNITED STATES of America**

v.

**Libia MONSALVE, John Monsalve, Lina Monsalve, and Luis Monsalve, Defendants.**

**No. 89 Cr. 602 (RPP).**

United States District Court, S.D. New York.

Jan. 5, 1990.

Otto Obermaier, U.S. Atty., S.D.N.Y. by Thomas McC. Souther, New York City for the U.S.

Joseph A. Ferrante, Passaic, N.J., for defendant, John Monsalve.

Goldberger & Dubin, P.C. by Lawrence A. Dubin, New York City, for defendant, Luis Monsalve.

Handelman, Hurwitz & Stampur by Michael Hurwitz, New York City, for defendant, Lina Monsalve.

Grossman, Lavine & Rinaldo by Charles Lavine, Forest Hills, N.Y., for defendant, Libia Monsalve.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

The defendants have been indicted for possession of cocaine, conspiracy to distrib-

ute cocaine and conspiracy to export cocaine. They now move to suppress evidence recovered following their arrests, including fourteen kilograms of cocaine recovered from a minivan in which several of the defendants had been riding, on the ground that their arrests were not based on probable cause. Defendant John Monsalve, joined by defendant Lina Monsalve, also moves to suppress the fourteen kilograms of cocaine on the ground that he did not voluntarily consent to the search of the minivan. Additionally, defendant Luis Monsalve moves to suppress $21,790 in United States currency seized from his apartment on the ground that he did not voluntarily consent to the search of his apartment, and to suppress any post-arrest statements that he made on the ground that he did not knowingly waive his rights. Defendant Lina Monsalve also moves for a severance of her trial from that of her co-defendants, and for a bill of particulars.

An evidentiary hearing was held on November 13, 1989. Based on the evidence elicited at the hearing, the facts set forth in the complaint, and the discussion below, the defendants' motions must be denied.

## I. FACTS

In February 1989, officers of the Royal Canadian Mounted Police ("RCMP") based in Montreal, Quebec, received information from a reliable confidential informant that Alix Osorio, a woman living at 4003 St. Andre Street in Montreal, was involved in a large cocaine trafficking operation at her residence. According to the informant, the cocaine was brought by vehicle from New York to Montreal by various couriers, including defendant Lina Monsalve, her mother (later determined to be defendant Libia Monsalve) and her brother (later determined to be defendant John Monsalve).

Around the end of June 1989, the RCMP began actively investigating the information received concerning cocaine trafficking at 4003 St. Andre Street. Surveillance established that rented minivans were regularly driving into the backyard of 4003 St. Andre Street where they remained for anywhere from several minutes to two hours

before leaving. On several occasions, the vehicles were followed to the United States border.

On July 14, 1989, RCMP surveillance officers at 4003 St. Andre Street observed Libia Monsalve, John Monsalve and Lina Monsalve arrive at that location in a Nissan Stanza and park in front of and enter the residence there. Minutes later, the same three individuals were seen leaving the backyard of that address in a rented minivan that Alix Osorio's son, Luis Felipe Osorio, had parked in the yard earlier that day. The Nissan in which the Monsalves had arrived was left in front of 4003 St. Andre Street. The RCMP followed the three Monsalves to the United States border, where they watched the minivan cross into the United States and continue south.

Late in July 1989, the RCMP positioned a video surveillance camera so that it provided a limited view of the backyard of 4003 St. Andre Street. Two days later, on the afternoon of August 1, 1989, Corporal Dan Paradis of the RCMP was watching the video screen monitor when a Ford minivan pulled into the backyard of 4003 St. Andre Street. Corporal Paradis saw Libia Monsalve, John Monsalve and Lina Monsalve walk past the minivan in the direction of the house. Shortly thereafter, John Monsalve walked to the rear of the minivan with Alix Osorio and opened the back of the minivan. Using what appeared to be Corporal Paradis to be a screwdriver, John Monsalve began working on the right interior panel of the minivan, eventually removing the interior panel. After John Monsalve and Alix Osorio examined the area behind the panel, John Monsalve replaced the panel and he, Libia Monsalve and Lina Monsalve entered the minivan and drove out of the backyard. The RCMP maintained surveillance of the minivan as it continued south from Montreal to the United States border. At the border, the Monsalves told United States Customs Service officers that they were travelling to the United States to go camping near Lake George.

Surveillance of the Monsalves in the minivan was maintained as they continued

south on Route 87. The surveillance officers observed that John Monsalve, who was driving the vehicle, followed a practice of occasionally increasing his speed to 75 or 80 miles per hour for a period of time after which he would slow to 35 or 40 miles per hour for a period of time. Despite having told the customs officials that they intended to go camping near Lake George, the Monsalves drove past the Lake George exits, stopping near Albany along the highway only to get gas, and eventually stopped for the night at approximately 1:00 a.m. on August 2, 1989 at a Holiday Inn near Suffern, New York. While the three Monsalves were inside the Holiday Inn, Corporal Paradis met with Special Agent Kevin Mancini and Group Supervisor Elaine Harris of the Drug Enforcement Administration ("DEA") and briefed them both on the background of the investigation by the RCMP involving cocaine trafficking at 4003 St. Andre Street, as well as the observations made on August 1, 1989.

At approximately 11:00 a.m. on August 2, 1989, the Monsalves left the Holiday Inn in the minivan and continued south on Route 87 toward New York City. Again, John Monsalve drove at intermittently high and low speeds. In Queens, the minivan stopped twice along Northern Boulevard and each time John Monsalve was seen making telephone calls, using several different public telephones. Some of these calls were made in a manner that the surveillance agents believed to be consistent with calls to a beeper. After this series of calls, the three Monsalves then drove east on Long Island to Port Washington, New York.

John Monsalve parked the minivan just off Main Street in Port Washington, and he, Libia and Lina walked to the vicinity of the entrance of a building located at 52 Main Street. Approximately 45 minutes later, they emerged from 52 Main Street, accompanied by two men, one of whom was carrying a cardboard box, which according to a radio transmission by an agent appeared to be weighted. The man carrying the box was later identified as Luis Monsalve, and the other as Dario Toro. John Monsalve, who was then carrying a brown paper bag, Libia Monsalve and Lina Monsalve returned to the minivan and followed a pickup truck driven by Luis Monsalve, who was accompanied by Dario Toro.

The surveillance agents, now aided by aerial surveillance from a helicopter, followed the pickup truck and the minivan to the Fresh Meadow Country Club, where both vehicles passed through a maintenance gate and then drove on a dirt road toward a warehouse in a wooded area of the golf course. DEA agents Mancini, Ray D'Alessio, George Whelan, Ben Butcher and Charles Engel, and RCMP Corporal Dan Paradis were guided by directions from the helicopter to an industrial parking area in the general vicinity of the warehouse and approached the warehouse on foot. As they approached the warehouse, Agent Mancini saw Luis Monsalve drive the pickup truck into the warehouse and then close the door from the inside. The minivan was not evident. Several agents positioned themselves in the woods with a view of the side of the warehouse into which the pickup truck had gone. Agent Mancini, the agent in charge at the scene, instructed Agents Butcher and D'Alessio to position themselves in the woods with a view of the narrower side of the warehouse, and the side of the warehouse opposite to the one which Agent Mancini could observe.

After approximately 45 minutes passed, Agent D'Alessio saw a door to the warehouse open and the blue minivan back out of the warehouse and drive around the side of the warehouse. Agent Butcher relayed this information by radio to the other agents. At about the same time, Agent Mancini saw a door open on his side of the warehouse. He saw Libia Monsalve, Luis Monsalve and Dario Toro standing in the doorway near the pickup truck. Libia Monsalve took several steps out of the warehouse and then looked back toward the doorway. Agent Mancini increased the volume on his hand-held radio in order to hear Agent Butcher's transmission, at the conclusion of which Agent Mancini's radio made a loud squelching sound. Libia Monsalve immediately snapped her head in the

direction of Agent Mancini and began walking slowly in his direction. As she approached him, Agent Mancini saw the minivan driving up to the corner of the warehouse. At that time, Agent Mancini gave the signal through his radio to effect the arrests.

Agent Mancini instructed Agents Engel and Whelan to contain Libia Monsalve, Luis Monsalve and Dario Toro, who were all near the pickup truck in the doorway. He then went toward the minivan. He identified himself as a police officer, and with gun drawn, instructed Lina Monsalve to get out of the front passenger seat of the minivan, which she did. Agent Mancini also instructed John Monsalve to get out of the driver's seat, and he obeyed. John Monsalve was walked toward the rear of the van and made to lay face down on the ground. Agent Mancini handcuffed John Monsalve and then walked him to the corner of the warehouse where the remainder of the defendants had been placed.

Agent D'Alessio gave John Monsalve *Miranda* warnings in English shortly after the defendants were assembled at the corner of the warehouse. John Monsalve, who spoke in English, acknowledged that he understood his rights, after which Agent Mancini took him aside, away from the other defendants, and asked him if he would permit the agents to search the minivan. John Monsalve grinned and gave Agent Mancini the permission.

The agents conducted an initial search of the minivan, which did not include looking behind the rear interior panels, and found no cocaine. The agents were concerned that if they looked behind the right rear interior panel at that time, the arrestees would realize the agents knew that John Monsalve had removed the panel in Montreal, and the Canadian portion of the investigation might be compromised. A canine unit from the United States Customs Service was requested and arrived at the scene approximately one hour after the arrests were made, and on the dog's second pass through the minivan, it reacted positively for the presence of a controlled substance in the area near the right rear interior panel of the minivan. Two kilograms of cocaine were recovered from behind the right rear interior panel and an additional twelve kilograms were recovered from behind the left rear interior panel. When John Monsalve was shown the cocaine and asked about it, he responded that he was not the ringleader, but also stated he wished to exercise his right to consult an attorney before making further statements.

Detective Edward Munoz of the Nassau County Police Department arrived at the warehouse about two hours after the arrests, having become lost while trying to find it, and was briefed by Agents Mancini and Butcher on the background of the investigation. Detective Munoz advised all of the defendants of their rights in Spanish, and they all acknowledged that they understood their rights.

Detective Munoz, Agent Butcher and Corporal Paradis then escorted Luis Monsalve to the rear of the warehouse where Detective Munoz spoke to Luis Monsalve in Spanish. After asking him some pedigree questions, Detective Munoz asked Luis Monsalve if he would give the agents permission to search his apartment at 52 Main Street. Detective Munoz told Luis Monsalve that the agents would get a search warrant anyway, but if he had nothing to hide he could cooperate by giving permission to search the apartment. Luis Monsalve told Detective Munoz that he had nothing to hide and gave his consent to search the apartment. Detective Munoz then escorted Luis Monsalve to the front of the warehouse where his handcuffs were removed. Detective Munoz translated a "consent to search" form into Spanish for Luis Monsalve which gave consent to search Apartment 11 at 52 Main Street, Port Washington, and Luis Monsalve signed the form. A search of that apartment recovered approximately $21,790 in United States currency in a bedroom in the apartment.

## II. DISCUSSION

### 1. Probable Cause to Arrest

Each of the defendants argue that the agents did not have probable cause to ar-

rest them and therefore the evidence recovered from them was obtained in violation of their Fourth Amendment rights and must be suppressed. The government argues that the agents had probable cause to arrest the defendants.

A determination of the existence or nonexistence of probable cause to arrest begins with the recognition that "[t]he history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would 'leave law-abiding citizens at the mercy of the officers' whim or caprice.'" *Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 413, 9 L.Ed.2d 441 (1963) (quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

Probable cause is more than mere suspicion. *Wong Sun v. United States,* 371 U.S. at 479, 83 S.Ct. at 413. Instead, "probable cause to arrest exists 'when the [agents] have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested.'" *United States v. Ceballos,* 812 F.2d 42, 50 (2d Cir.1987), quoting *United States v. Fisher,* 702 F.2d 372, 375 (2d Cir.1983); *accord United States v. Ginsberg,* 758 F.2d 823, 828 (2d Cir.1985).

■ The issue in this case is not, as in some cases, whether the Monsalves were the proper people to arrest for a crime the police knew had been committed, but whether, based on what the agent causing the arrest to be made knew about the Monsalves, the agent had probable cause that a crime was being or had been committed. In such a case, probable cause to arrest only exists if the agent causing the arrest to be made possesses reliable facts making it more likely than not that the activity was criminal rather than innocent. *See* 1 LaFave, *Search and Seizure,* § 3.2(e), at p. 595 (1987); *People v. Russell,* 34 N.Y.2d 261, 357 N.Y.S.2d 415, 313 N.E.2d 732 (1974); *People v. Martin,* 9 Cal.3d 687, 108 Cal.Rptr. 809, 511 P.2d 1161, *cert. denied,* 414 U.S. 1113, 94 S.Ct. 844, 38 L.Ed.2d 740 (1973).

Probable cause is not established by a neat legal standard, as it is "a fluid concept—turning on the assessment of probabilities in particular factual contexts." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983); *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983). Thus, a determination of probable cause involves an evaluation of the totality of the circumstances. *Illinois v. Gates,* 462 U.S. at 230, 103 S.Ct. at 2328.

The arresting agent in charge in this case obtained information as to the defendants from two sources: his and his colleagues' first-hand observations, and the briefing given to them by Corporal Paradis of the RCMP. Corporal Paradis' information had come from his and his colleagues' surveillance, as well as from a confidential informant. The observations of RCMP investigators were legitimate factors in the agents' decision to arrest the defendants. *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). Moreover, the information obtained from the confidential informant, when corroborated to a substantial degree by the surveillance conducted by the RCMP and the DEA, was likewise properly relied upon by the agents in reaching the decision that there was probable cause to arrest. *Illinois v. Gates,* 462 U.S. at 241, 103 S.Ct. at 2334.

Each of the actions observed was innocent in and of itself. Various innocent explanations could be given for the sequence of activity the agents had witnessed. However, to constitute probable cause, there need only be a probability that a crime has been committed. A strong suspicion of criminal activity could be inferred from the totality of the observations of unusual activity made by the RCMP and the DEA. The suspicious conduct included being among a group of people who were regularly driving rented minivans from a house identified by an informant as the base of a drug trafficking operation, and a house they did not inhabit, to the U.S. border and continuing south; removing and

inspecting the interior panel of the rented vehicle while in the backyard of the house; failing to exit near Lake George after telling customs officials at the border that Lake George was their destination; driving in a manner consistent with attempting to detect surveillance; making calls from public telephones in a manner consistent with calls to beepers; and carrying a weighted box from the building in which Luis Monsalve lived to a pickup truck, which accompanied the rented vehicle to a secluded warehouse into which both vehicles disappeared behind closed doors for 45 minutes.

Whether the suspicion engendered by that conduct alone would be strong enough to constitute probable cause to arrest need not be decided in this case in light of the fact that the observed activity of the defendants corroborated important details of a story of criminal activity given by a reliable confidential informant. The combination of the first-hand information and the informant's tip gave the agents in this case probable cause to believe that the defendants were engaged in the commission of a crime, namely transporting narcotics. The informant had accurately informed the RCMP that the Monsalves were among a group of people making trips from 4003 St. Andre Street to New York and back. While the corroboration of the innocent aspects of the informant's tip was probably not enough to establish probable cause to arrest, the substantial suspicious conduct observed by the agents, in addition to the tip, created a sufficient probability that a crime was being committed that the arrests did not violate the requirements of the Fourth Amendment.

As in many cases, it is possible, even likely, that the arresting agents in this case could have confirmed their suspicions about the Monsalves by prolonging the surveillance until more concrete evidence of criminal wrongdoing made the decision to arrest unassailable. However, that option became unavailable to the agents as a result of Libia Monsalve's apparent detection of the sound of Agent Mancini's radio. Facing the prospect of a possible gun battle, high-speed chase or destruction of evidence if they did not move in immediately, Agent Mancini made a reasonable decision to effectuate the arrests. This is not meant to imply some "exigent circumstances" exception to the probable cause requirement for arrests, but rather to point out that the possibility of obtaining further evidence that the Monsalves were committing a crime before arresting them had been foreclosed by events peculiar to this case.

Finally, the existence of probable cause to arrest one person does not allow the arrests of others in his company. Probable cause must exist as to each individual arrested. Although in a cumulative sense there may have been more suspicious activity on the part of John Monsalve than the others, the totality of the circumstances confronting the arresting agents in this case were such that there was no reason to believe that any of the defendants were significantly less involved in the suspected criminal activity than he was.

Each of the defendants was present in circumstances suggesting their knowledge and complicity in what appeared to be a scheme to transport drugs. The confidential informant had specifically identified John, Libia and Lina Monsalve as couriers. Libia and Lina had accompanied John on a prior trip into the United States from 4003 St. Andre Street. Libia and Lina were in the car when U.S. customs officials were told that they were travelling to Lake George. In what were already suspicious circumstances, Luis Monsalve had appeared carrying a weighted box out of the building in which he lived and had accompanied the other defendants to the secluded warehouse where both cars were taken inside and the doors closed on a sunny day in August. Thus, there was more than mere association with John Monsalve linking each of the defendants to the suspected criminal activity. Accordingly, given the totality of the circumstances in this case, there was probable cause to arrest all of the defendants.

2. The Search of the Minivan

█ John Monsalve seeks the suppression of the fourteen kilograms of cocaine

recovered from the rear interior panels of the minivan on the ground that he did not voluntarily consent to the search of the minivan. Lina Monsalve joins in this motion.

The government does not justify its warrantless search of the minivan on the so-called "automobile exception" to the warrant requirement established in Supreme Court cases such as *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) and *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), which allows, under many circumstances, warrantless searches of automobiles upon probable cause because of their inherent mobility and the reduced privacy interests people enjoy in them. The government instead argues (1) that John Monsalve voluntarily consented to the search of the minivan, and (2) the minivan could be searched because it was subject to forfeiture under federal law.

A warrantless search conducted pursuant to the voluntary consent of a person with a privacy interest in the area to be searched is constitutionally permissible. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). Here, the defendants do not dispute the fact of the consent, only its voluntariness. The question of voluntariness is a "question of fact to be determined from the totality of all the circumstances," *Id.* at 227, 93 S.Ct. at 2047–48, and the burden is on the government to establish by a preponderance of the evidence that the consent was voluntary. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Thus, relevant factors are the age, education and intelligence of the person by whom consent is given, the length of detention, the use of physical punishments or deprivations, and whether the person was advised of his constitutional rights. *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047; *United States v. Ceballos*, 812 F.2d at 51; *United States v. Puglisi*,

790 F.2d 240, 243 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986). Other relevant factors are whether guns were drawn, or the person frisked, *United States v. Vasquez*, 638 F.2d 507, 524 (2d Cir.1980), *cert. denied*, 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981), whether the consenting individual was threatened, was in a public area, or was informed that he had the option of refusing to consent. *United States v. Vasquez–Santiago*, 602 F.2d 1069, 1073 (2d Cir. 1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980).

John Monsalve asserts in an affidavit submitted with his motion papers that his consent was coerced by the agents in that they threatened him with their guns drawn, and told him if he did not consent his mother and sister would be going to jail. He also claims that he was never told that he had the right to refuse consent. In credible testimony given at the hearing, Agent Mancini testified that, although John Monsalve was placed under arrest by agents with guns drawn and handcuffed, the agents' guns were holstered and he had been advised of his constitutional rights and acknowledged that he understood them prior to the time he gave his consent. There was no testimony of threats against John Monsalve, or of any other facts suggesting that the consent was coerced. Therefore, under the totality of the circumstances, John Monsalve's consent to the search of the minivan was voluntary, and the warrantless search of the minivan was permissible.[1]

### 3. The Search of Luis Monsalve's Apartment

 Luis Monsalve seeks to suppress evidence recovered from his apartment following his arrest, including approximately $21,790 in U.S. currency, on the grounds that he did not voluntarily consent to such search.

The discussion above with respect to the standards to be applied to determine the voluntariness of a consent to a search ap-

---

1. As a result of this determination, the Court need not reach the government's alternative argument that the forfeiture statute allows the warrantless search in this case.

plies with equal force here. Thus, the issue again is whether Luis Monsalve's consent was voluntary, a question of fact to be determined from the totality of the circumstances.

Luis Monsalve asserts, and Detective Munoz conceded in his testimony, that he was told that the agents would get a search warrant for his apartment unless he consented to the search. Such a statement does not render a subsequent consent involuntary where there is a sound factual basis for the assertion. *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir.1983), *cert. denied*, 471 U.S. 1021, 105 S.Ct. 2030, 85 L.Ed.2d 313 (1985). Luis Monsalve argues that, at the time of Munoz's statement, probable cause to search his apartment did not exist and therefore the statement that a warrant would be obtained inevitably was without a sound factual basis. However, there was in all likelihood sufficient evidence at the time to obtain such a warrant, given the surveillance which had established that the minivan which had just been discovered to contain substantial amounts of cocaine had stopped near the building in which Luis Monsalve lived, the other three Monsalves had entered that building, Luis Monsalve had accompanied them out carrying a large box that appeared to be weighted, and the defendants then proceeded in two vehicles directly to the isolated warehouse, from which emerged the minivan in which the cocaine was found. In light of that evidence, which created a logical inference that the cocaine had been in the apartment and that a transaction involving cocaine occurred there, there was sufficient basis for the issuance of a warrant to search Luis Monsalve's apartment for evidence of the crime. In the absence of other facts suggesting that the consent was in some way coerced, the statement that a search warrant could be obtained did not render the consent involuntary.

**4. Motion for Severance and Bill of Particulars**

Lina Monsalve has not made a sufficient showing that she will be prejudiced by a joint trial to justify the granting of her motion for severance. Fed.R.Crim.Proc. 14; *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir.), *cert. denied*, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984). Nor is the bill of particulars she demands pursuant to Fed.R.Crim.Proc. 7 required, as the indictment sufficiently advises her of the specific acts of which she is accused. *United States v. Leonelli*, 428 F.Supp. 880, 882 (S.D.N.Y.1977); *see also United States v. Salazar*, 485 F.2d 1272 (2d Cir.1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974).

### III. CONCLUSION

For the foregoing reasons, the defendants' motions to suppress evidence are denied in their entirety. Defendant Lina Monsalve's motions for severance and a bill of particulars are denied.

SO ORDERED.