**UNITED STATES of America, Appellant,**

v.

**Romanus ISIOFIA, Defendant–Appellee.**

**Docket No. 03–1287.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 20, 2004.

Decided: June 1, 2004.

Steven D. Feldman, Assistant United States Attorney (Adam B. Siegel, Assistant United States Attorney, on the brief), for James B. Comey, United States Attorney for the Southern District of New York, New York, NY, for Appellant.

Tai H. Park (William Hauptman, on the brief), Shearman & Sterling LLP, New York, NY, for Defendant–Appellee.

Before: KATZMANN, B.D. PARKER, Circuit Judges, and PRESKA, District Judge.*

B.D. PARKER, JR., Circuit Judge.

The United States appeals from an order of the United States District Court for the Southern District of New York (Harold Baer, Jr., *Judge* ), suppressing physical evidence—principally social security cards bearing various numbers and names—seized in Defendant Romanus Isiofia's apartment. The seizure by at least eight federal and New York City law enforcement officers occurred during a warrantless home search after the agents, according to the District Court, encamped in the apartment for a lengthy period of time in furtherance of their investigation and apparently in anticipation of obtaining Isiofia's consent to the search. Following a hearing, the District Court concluded that the items were seized in violation of the Fourth Amendment. Because we conclude that the District Court did not clearly err in concluding that Isiofia's consent was not voluntary, we affirm.

## BACKGROUND

In March 2001, the Cole Computer Corporation, a computer vendor, was contacted by Modular Computers inquiring about the purchase of some $12,000 in computer parts. Modular subsequently faxed a purchase order to Cole, which provided four different credit card numbers and requested that the cost of the computer parts be split equally among the cards. A letter from a "Dennis Brown," the "Director" of Modular, accompanied the purchase order and purported to authorize the purchase. Cole initially processed the order, but subsequently suspected that the transaction was fraudulent, canceled it, and contacted the U.S. Secret Service.

After an investigation, the Secret Service learned that the charges were unauthorized and that the four credit cards had been stolen. The Secret Service also learned that "Dennis Brown" of Modular had asked Cole to ship the computer parts to an individual named "Robert Heskey" at an apartment in the Bronx, New York, that subsequently was determined to be Isiofia's address.

In an effort to identify and arrest the individual attempting to use the stolen credit card numbers, several law enforcement officers, including members of the Secret Service, the U.S. Postal Inspection Service, and the New York City Police Department, organized a controlled delivery of the computer parts. For reasons not apparent on the record, the agents did not apply for a search warrant or an anticipatory arrest warrant, although ample time to do so existed. On the morning of March 27, approximately six days after the parts were ordered, Postal Inspector Andre Esannason dressed as a mail carrier and, along with Special Agent Karen Fontana Graves of the Secret Service and Detective Tony Cruz of the NYPD, went to Isiofia's apartment with the packaged com-

---

* The Honorable Loretta A. Preska, of the United States District Court for the Southern District of New York, sitting by designation.

puter parts. After Isiofia admitted them into the building, Esannason proceeded to Isiofia's apartment door to deliver the package, while Graves and Cruz hid in a stairwell nearby awaiting the prearranged signal to move in and arrest whomever accepted delivery of the package as Robert Heskey.

When Esannason arrived at the apartment, the door was open and Isiofia was waiting in the doorway. Esannason informed Isiofia that he had a package for Robert Heskey and asked Isiofia if he were Heskey. Isiofia nodded affirmatively, but signed two different postal receipts with the name "T. Smith," something Esannason did not realize until later. After Isiofia signed the postal receipts, Esannason gave the prearranged signal for Graves and Cruz to move in for the arrest. As they approached, Isiofia backed into his apartment. The agents followed Isiofia into the foyer of his apartment, where they arrested and handcuffed him. Cruz then radioed for assistance, and Esannason, Graves, and Cruz waited inside Isiofia's apartment for the other officers to arrive. Moments later, five to seven law enforcement officers, including Special Agents William Guida and Brendan McGee, entered the apartment. At that point, Esannason informed Guida, the case agent, that Isiofia had signed the postal receipts with the name "T. Smith" rather than "Robert Heskey."

Shortly after entering the apartment, Guida and McGee (with no weapons drawn) conducted a protective sweep which lasted approximately two minutes. After the protective sweep, McGee handcuffed Isiofia to a chair at a table near the entrance to the apartment. When he asked Isiofia his name, McGee had trouble understanding the response and consequently asked Isiofia for identification. Isiofia pointed toward a closed briefcase across the room. McGee asked if he could open the briefcase and retrieve the identification, and Isiofia answered affirmatively. Inside the briefcase, McGee found an identification card for Isiofia and removed it. He also saw several other social security cards with other names on them, but did not remove them at that time.

The officers then completed arrest-related paperwork, a task that took approximately thirty minutes. The detailed information the officers obtained from Isiofia included his name, residence, bank account information, ages and dates of birth of his children, the names and phone numbers of several relatives, his passport number, and his employment and social security numbers. Isiofia was under arrest at the time this information was assembled, and the record reflects that the agents claimed they completed the paperwork in his home, as opposed to a police station, out of convenience.

After the agents completed the paperwork, McGee read *Miranda* warnings to Isiofia from a waiver-of-rights form, and Isiofia executed a written waiver of those rights. Isiofia also signed a consent-to-search form, permitting Guida and McGee to search his apartment and car. On that form, the space for the nature of the contraband or evidence sought was left blank. A short while later, McGee filled out another consent-to-search form for Isiofia's computer located in the apartment, which Isiofia also signed. On that form, the space for the names of the persons authorized to perform the search was left blank, but the nature of the contraband or evidence sought was identified as "crime/package delivery." No separate consent form was executed for the search of Isiofia's briefcase. After obtaining his signature on the two forms, the officers searched the briefcase, apartment, car, and computer. They found fifteen social secu-

rity cards issued in the names of approximately eleven individuals. Among those fifteen cards were two in the name of Romanus Isiofia bearing different social security numbers.

In September 2002, a grand jury returned a four-count indictment charging Isiofia with (1) using a social security number assigned to him on the basis of false information to obtain payments or other benefits to which he was not entitled in violation of 42 U.S.C. § 408(a)(7)(A) and 18 U.S.C. § 2; (2) possessing a counterfeit resident alien card in violation of 18 U.S.C. §§ 2, 1546(a); (3) producing counterfeit resident alien and social security cards in violation of 18 U.S.C. §§ 2, 1028(a)(1), (b)(1)(A)(i), (c)(1); and (4) possessing social security cards, a false social security card, a U.S. passport, and driver's identification cards in the names of five or more individuals in violation of 18 U.S.C. §§ 2, 1028(a)(3), (b)(2)(B), (c)(1). Isiofia was not charged with purchasing the computer parts using stolen credit cards.

Isiofia moved to suppress the physical evidence seized from his apartment and a statement in which he told law enforcement officers his social security number. The District Court held a hearing at which Esannason, McGee, Graves, and Isiofia's wife, Mercy Orji, testified. After the hearing, the Court suppressed the physical evidence, but not Isiofia's statement. *United States v. Isiofia,* No. 02 CR. 520(HB), 2003 WL 21018853 (S.D.N.Y. May 5, 2003). In suppressing the physical evidence, the District Court articulated two, independent reasons for concluding that, despite Isiofia's consents, the items had been unlawfully obtained. *Id.* at *4. First, the Court found that the search violated the Fourth Amendment because the agents entered Isiofia's home without a warrant in the absence of exigent circumstances and because they performed a protective sweep in the absence of danger to those on the scene. It reasoned that the physical evidence seized following the warrantless entry and sweep was fruit of the poisonous tree not sufficiently attenuated from the illegality of the agents' search. *Id.* at *4–7. Second, the Court considered the circumstances of the arrest—including the amount of time the agents were in Isiofia's apartment, the number of agents there, the lack of information provided to Isiofia, the illegality of the entry into the apartment, and the behavior of the agents—and found his consents not voluntary. *Id.* at *7–9. "Under either analysis," the Court concluded, "the evidence obtained pursuant to [Isiofia's] purported consent[s] to search his briefcase and his apartment, car, and computer must be suppressed." *Id.* at *4. The government appeals.

## DISCUSSION

■ On appeal, the government challenges both grounds for suppressing the physical evidence. First, it argues that neither the warrantless entry nor the sweep violated the Fourth Amendment, and that, in any event, Isiofia's consents were sufficiently attenuated from the entry and the sweep to purge any taint resulting from them. *See Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Second, the government contends that the consents were indeed voluntary. Because we conclude that the District Court did not clearly err in finding Isiofia's consent involuntary, we need not reach the other ground for suppression for the government does not contend that if Isiofia was lawfully arrested, the agents were permitted to open his briefcase or search his computer, apartment, and car in the absence of his valid consent.

■ The government has the burden of proving, by a preponderance of the evidence, that a consent to search was volun-

tary. *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir.1983). Voluntariness is a question of fact determined by a "totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "[T]he ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir.1995) (quoting *United States v. Sanchez*, 32 F.3d 1330, 1334 (8th Cir.1994)); *see Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

The District Court, after weighing evidence adduced during a hearing heavily driven by credibility determinations, found that Isiofia's consent was not voluntary. In so doing, the Court considered a number of factors. Among other things,[1] the Court considered the time that elapsed between Isiofia's arrest and his consent. It found that Isiofia's consent to open and search his briefcase was given only minutes after the initial entry by the agents, "close in time to what must have been a very startling, to say nothing of harrowing, series of events." *Isiofia*, 2003 WL 21018853, at *8. It also found that the time that elapsed between the agents' entry and Isiofia's consent to search his apartment and car (somewhere between thirty minutes to one hour and fifteen minutes) "tend[ed] toward a finding of coerciveness" because "all the while there were eight agents in his living room with him and he was handcuffed to the table." *Id.* It also found pertinent the fact that Isiofia is "an immigrant and not a native English-speaker, a fact readily apparent to the agents who had some difficulty understanding the defendant given his accent." *Id.* Next, the Court considered the information the agents provided to Isiofia and found that there was "no indication that [Isiofia] was ever appr[i]sed of what crime he was being charged with or what evidence the government hoped to seize; nor was he informed that he had the right to refuse consent." *Id.* at *9. As part of its inquiry into the information provided to Isiofia, the Court examined the two consent-to-search forms, one of which it concluded provided "a helplessly vague description of the nature of the evidence and contraband to be seized" and the other "simply left this detail blank." *Id.* Finally, the Court considered the legality of the warrantless entry, finding that the agents "should have known that their entry into and search of the

---

**1.** The parties disputed below whether Isiofia was intoxicated that morning. Isiofia did not testify at the suppression hearing, but submitted an affidavit stating that he is a recovering alcoholic and that he was "highly intoxicated" at the time he was arrested. Isiofia's wife testified at the suppression hearing, confirming that Isiofia is an alcoholic and stating that Isiofia had arrived home earlier that morning, at approximately 4:00 a.m., carrying two 40-ounce bottles of malt liquor, one of which he proceeded to open and drink while watching television. She testified that she then went to bed and awoke at 7:00 a.m. and that, upon leaving the apartment an hour later, she noticed Isiofia "sitting down drinking as usual." The three law enforcement officers who testified at the hearing, however, stated that they detected no alcohol on Isiofia's breath and observed no other common signs of inebriation such as slurred speech, red eyes, dizziness, or incoherence. But they did concede to seeing an open and partially empty bottle of beer. The Court found that Isiofia "had been drinking that morning and although not perfectly lucid, was also capable of comprehending," and it ultimately concluded that his state of intoxication was only a "minor factor on the voluntariness scale." *Isiofia*, 2003 WL 21018853, at *8.

defendant's apartment was illegal." *Id.* Considering all these circumstances, the Court found that "it was objectively *unreasonable* for the agents to believe that the defendant's consent to open and search his briefcase and his consent to search the apartment, computer and car were voluntary." *Id.* (emphasis in original).

The government challenges this finding. First, it contends that there was nothing coercive about the length of Isiofia's detention; the agents merely solicited pedigree information and in so doing neither coerced nor threatened Isiofia. The government further argues that the fact that Isiofia was not a native English speaker does not mean he was coerced, and that the agents and Isiofia had no trouble understanding each other. Second, the government argues that the District Court should not have considered whether Isiofia was informed of the crime he was being charged with or what evidence the government hoped to obtain during the search. Rather, the government maintains, the only factor relevant to the Court's consideration was whether Isiofia had been informed of his right to refuse consent, and both consent-to-search forms signed by Isiofia expressly informed him of that right. Finally, the government contends that neither the entry nor the protective sweep were illegal, and, even if they were, Isiofia's consents were sufficiently attenuated to purge the taint arising from them.

In addressing these contentions, it is important to remember that we review the District Court's conclusions on the voluntariness of Isiofia's consents for clear error. *See United States v. Puglisi,* 790 F.2d 240, 244 (2d Cir.1986). Under this standard, "[if] the district court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact,

[we] would have weighed the evidence differently." *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). In other words, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574, 105 S.Ct. 1504. Thus, a " 'finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Id.* at 573, 105 S.Ct. 1504 (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). This is so whether or not the district court's findings rest on credibility determinations. But where, as here, findings are based on credibility determinations, even greater deference is required, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575, 105 S.Ct. 1504 (citing *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)).

We cannot say that the District Court's conclusion on the voluntariness of Isiofia's consent is clearly erroneous. The Court's finding of coerciveness stemming from the length of Isiofia's detention is grounded in the record. As the District Court noted, the evidence showed that Isiofia consented to the search of his apartment and car only after being handcuffed to a table for over thirty minutes in the presence of numerous law enforcement agents, some of whom extracted detailed personal and financial information from him. Although the officers testified that they neither threatened nor yelled at Isiofia, his affidavit testimony, which the District Court considered, tells a different story. In that sworn affidavit, Isiofia claims that the agents "demanded" his consent and told him "that if

[he] did not provide [his] consent, [he] would be jailed and deported and would never see [his] family again." He also claims that the agents "yelled" at him using "abusive language." Similarly, with respect to Isiofia's facility with English, even though the government now claims that the agents and Isiofia had no trouble understanding one another, Special Agent McGee testified that upon asking Isiofia his name, he could not understand the response, which is the justification he offered for needing to search Isiofia's briefcase for identification in the first place. Isiofia also offered evidence to this effect in his affidavit, which states that he "often ha[s] difficulty speaking and understanding" English. In light of all this evidence, we cannot say the government carried its burden of demonstrating that the District Court's finding was clearly erroneous.

Nor is a contrary result compelled by the District Court's belief that the agents neglected to tell Isiofia that he had a right to refuse consent. *See Isiofia*, 2003 WL 21018853, at *9. We acknowledge that, with respect to Isiofia's consent to search

his apartment, the consent-to-search forms signed by Isiofia expressly advised him of that right.[2] However, Isiofia's affidavit, as noted above, provides a different version of the relevant events and contains evidence of involuntariness in the form of coercive statements and of threats that the District Court was free to, and apparently did, credit.[3]

The Court also considered the fact that the agents had not informed Isiofia of what type of evidence they expected to seize or the crime they expected to charge. *Isiofia*, 2003 WL 21018853, at *9. The government contends that since the agents were under no obligation to disclose this information to Isiofia, the Court, in determining voluntariness, should not have considered it. This objection misconstrues the task before the District Court which was to resolve the issue of voluntariness based on the "totality of all the circumstances." *Bustamonte*, 412 U.S. at 227, 93 S.Ct. 2041. What the officers did or did not say to a defendant before searching may not be dispositive, but it is certainly the type of factor a district court can—and

2. The government neither contends that the agents informed Isiofia of his right to refuse consent to the initial briefcase search nor points to any other evidence establishing the voluntariness of Isiofia's consent to that search. We conclude, therefore, that it has not discharged its burden in this regard. *See Bustamonte*, 412 U.S. at 233, 93 S.Ct. 2041 (noting that consent is not voluntary if "granted only in submission to a claim of lawful authority"). *Compare United States v. Ruiz–Estrella*, 481 F.2d 723, 728 (2d Cir. 1973) (holding that, where defendant was taken away from a public area of airport behind a closed door where only he and sky marshal were present and where sky marshal searched defendant's shopping bag and discovered a shotgun, "the government has shown no more than acquiescence to apparent lawful authority, and the theory of consent cannot be accepted"), *with United States v. Vasquez–Santiago,* 602 F.2d 1069, 1073 (2d Cir.1979) (finding consent voluntary where

defendant "was not threatened, was in a public area of the terminal with the agents, and was informed that he had the option of refusing consent to the search pending the agents' obtaining a search warrant, unlike the situation in *United States v. Ruiz–Estrella* ").

3. In any event, the District Court did not treat this factor as dispositive, but merely as one consideration in the totality of the circumstances. *See Bustamonte*, 412 U.S. at 233, 93 S.Ct. 2041 ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent."). Therefore, even were we to conclude that the District Court clearly erred in finding that Isiofia was not informed of his right to refuse to consent to the search of his apartment, the Court's ultimate finding of involuntariness is supported by the other reasons it articulated.

should—consider among the totality of the circumstances. Here, the District Court believed it was one of a number of factors weighing against voluntariness.

 Finally, even assuming *arguendo* that the officers' warrantless entry and protective sweep were not illegal, we agree with the Court that the agents improperly remained in the apartment after completing the sweep. *Isiofia*, 2003 WL 21018853, at *4. We have explained, in clear terms, that

> [o]nce police eliminate the dangers that justify a security sweep—safety of police, destruction of evidence, escape of criminals—they must, barring other exigencies, leave the residence. Were this not the rule, searches begun as minor intrusions on domestic privacy would expand beyond their legitimate purposes. This concern is particularly germane to government-citizen encounters where, as here, agents subsequently seek the resident's consent to search his domicile.

*United States v. Oguns*, 921 F.2d 442, 447 (2d Cir.1990). Special Agent Graves, who after the protective sweep made the decision to take the pedigree information from Isiofia in his home as opposed to elsewhere, cited no exigency justifying the agents' protracted presence in the apartment. On the contrary, she testified that she took the information where she did for convenience. Again, the District Court properly weighed the length of time the eight agents remained in the home after the protective sweep among the totality of circumstances establishing involuntariness. Ultimately, therefore, we hold that the District Court committed no clear error in concluding that Isiofia's consent was involuntary. Its determination is supported by the evidence and, in our view, is "plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 574, 105 S.Ct. 1504.

## CONCLUSION

For the foregoing reasons, the order of the District Court is affirmed.