SMITH, BUCKLIN & ASSOCIATES, INCORPORATED, Appellant,

v.

William SONNTAG and Victoria Shaw, Appellees.

No. 95–7266.

United States Court of Appeals, District of Columbia Circuit.

Argued March 28, 1996.

Decided May 14, 1996.

Charles R. Work, Washington, DC, argued the cause for appellant, with whom Melvin White, was on the briefs.

William B. Reynolds, Washington, DC, argued the cause for appellees. William J. Rodgers and Charles B. Long, were on the brief.

Before: SILBERMAN, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellant seeks to enjoin two former employees, based on a covenant in their employment contracts, from working for a competitor on behalf of previous clients. The district court concluded that the contract clause did not cover the appellees' activities. We are inclined to disagree but since appellant has not clearly demonstrated that it will suffer irreparable harm, the district court's refusal to issue a preliminary injunction is affirmed.

## I.

Smith, Bucklin is a management company that provides services to various trade and professional associations. It conducts such activities as government relations services (keeping track of the current regulatory situation, lobbying, and developing relationships with governmental agencies and officials), administrative services, public relations, customer relations, marketing, and research services for its clients. Smith, Bucklin's employees usually become closely associated with clients, often holding titles that identify them with the organizations they serve. William Sonntag was hired by Smith, Bucklin in 1989 to manage the government relations work of the National Association of Metal Finishers (NAMF), a Smith, Bucklin client since 1977. Subsequently, the American Electroplaters and Surface Finishers (AESF) and Metal Finishers Suppliers' Association (MFSA), although never establishing a client relationship directly with Smith, Bucklin, made contributions to NAMF so that they could receive information gathered by Smith, Bucklin's NAMF government relations operation. Victoria Shaw was hired to assist Sonntag in his work for NAMF. Sonntag's title was NAMF's "Director of Government Relations," and Shaw was its "Senior Manager of Government Relations."

Sonntag and Shaw, without at the time telling Smith, Bucklin, accepted positions in May, 1995 with one of Smith, Bucklin's competitors, National Environmental Strategies (NES). On June 5, 1995, NAMF told Smith, Bucklin that it was switching to NES. Not surprisingly, when NAMF left so did AESF and MFSA. Sonntag and Shaw were told, on

June 12, that their employment was terminated as of June 17 (the date NAMF formally entered into a client relationship with NES). They promptly shifted to NES, continuing to provide the same government relations services for NAMF, AESF, and MFSA.

Smith, Bucklin filed a complaint seeking damages and injunctive relief against Sonntag and Shaw for allegedly breaching a covenant not to compete and their common-law duty of loyalty. The source of the purported contractual obligation is the first prohibition in the covenant, in all of Smith, Bucklin's employment contracts with its high-level executive or managerial employees, which states:

> Executive agrees that, during his employment by Company and for a period of 10 months after the effective date of the termination of such employment (for any reason and whether by Executive or Company), he will not directly or indirectly, alone or in conjunction with, through, or for any other person, firm, association or corporation, (1) *solicit or accept the business of managing or advising on the management of any association, organization, society or other person or entity which at any time during the three years ending with Executives termination, was a Company client, customer or source of business with which Executive dealt or had any contact as an account executive* or (2) otherwise cause or contribute to the diversion from Company of any such business.

(Emphasis added.) The contract also provides that, if the employee violates the covenant, irreparable injury will result to the company and the employee agrees to be enjoined.[1] The District of Columbia Superior Court issued a temporary restraining order prohibiting Sonntag from performing services for NAMF, which was later expanded to cover AESF and MFSA. It refused to impose a restraining order on Shaw. The case was removed to federal district court and Smith, Bucklin sought a preliminary injunction prohibiting Sonntag and Shaw from performing government relations work at NES for NAMF, AESF, and MFSA until June 30, 1996.

The district court, applying District of Columbia law,[2] vacated the temporary restraining order and refused to issue a preliminary injunction, holding that Sonntag and Shaw's government relations work did not entail the "managing or advising on the management" of any organization. (Whether Sonntag or Shaw violated the second prohibition, "otherwise cause or contribute to the diversion from Company of any such business," is still pending before the district court.) The court noted that restrictive covenants are narrowly construed and, like all contracts, construed against the drafter—Smith, Bucklin. The court thought the contract, furthermore, was one of adhesion—a contract entered into between parties with vastly unequal bargaining positions—because Smith, Bucklin has been inserting this covenant into its employment contracts for the last 20 years and the provision was not discussed when Sonntag and Shaw were hired. As applied to Shaw, the restrictive covenant was, moreover, against public policy since she earned only $35,000 a year, had been an employee at Smith, Bucklin for less than a year, was terminated on 5 days notice with no continuing health insurance or severance pay, and since the covenant's enforcement would result in her unemployment for 10 months. Finally, Smith, Bucklin itself had not fulfilled its obligations under the contracts by delaying Sonntag's contractually guaranteed severance pay and by firing Shaw with only 5 days notice even though she was, according to her contract, a "month to month" employee.

---

1. The provision states that if the employee violates the covenant:

> [I]rreparable injury will result to Company; accordingly, Executive agrees that in any suit that may be brought by Company or its successors for the violation by Executive . . . an order may be entered in such suit enjoining him from such violations, such an order may be entered pending the litigation as well as on final determination thereof. . . .

2. Although Shaw's employment agreement contains a choice-of-law provision providing that Illinois law is the applicable law, the district court noted that the parties "agreed that the substantive law applicable in this case is the law of the District of Columbia." Neither party, on appeal, disagrees.

## II.

 Smith, Bucklin claims that the district court erred in concluding that it had not met the first prerequisite for obtaining a preliminary injunction:

> [plaintiff must] clearly demonstrate[ ] (1) *that there is a substantial likelihood [it] will prevail on the merits;* (2) that [it] is in danger of suffering irreparable harm during the pendency of the action; (3) that more harm will result to [it] from the denial of the injunction than will result to the defendant from its grant; and, in appropriate cases, (4) that the public interest will not be disserved by the issuance of the requested order.

*Wieck v. Sterenbuch,* 350 A.2d 384, 387 (D.C.App.1976) (emphasis added). Sonntag and Shaw disagree, contending that the district court's interpretation of the contract was correct and should not be disturbed, especially in light of our limited scope of review of the district court's determination. As a general rule, a district court's decision whether to grant a preliminary injunction is reviewed under the deferential standard of "abuse of discretion." This is so because such a decision is typically based on equitable considerations that are properly considered and weighed by the lower court. *See City of Las Vegas v. Lujan,* 891 F.2d 927, 931 (D.C.Cir.1989). However, to "the extent the district court's decision hinges on questions of law our review is essentially *de novo.*" *O'Hara v. District No. 1–PCD,* 56 F.3d 1514, 1522 (D.C.Cir.1995) (citation omitted). And, a question concerning the proper interpretation of the plain language of a contract is a question of law. *See Hershon v. Gibraltar Bldg. & Loan Ass'n,* 864 F.2d 848, 852 (D.C.Cir.1989). Only if the contract is sufficiently ambiguous that the district court's consideration of extrinsic evidence to establish the parties' intent was proper do Sonntag and Shaw obtain the deferential "clearly erroneous" standard of review and then only with respect to subordinate fact finding. *Id.*

Sonntag and Shaw's fundamental position is that their action did not violate the clause, properly interpreted. They did not and do not engage in "managing or advising on the management" of NAMF *while under the employ of NES* because they are only performing government relations services (they are "merely lobbyists") and NES—unlike Smith, Bucklin—offers *only* these government relations services. Smith, Bucklin, in other words, undertook to provide a broader range of services to its clients than does NES, and it is only that entire package—or at least elements of the package other than government relations—that constitute "management services."

We think what NES generally offers its clients is not particularly relevant; the key question is what did "managing or advising on the management" mean at Smith, Bucklin. Ordinarily the government relations function at an organization would be thought every bit as much a part of "management" as would accounting, personnel, public relations, or the comptroller and general counsel's functions. But in determining what the phrase means in the employment contract it is appropriate to focus on how the parties used the term. It seems rather clear, in that respect, that Sonntag and Shaw, *while under Smith, Bucklin's employ,* perceived themselves as engaged in managing or advising on the management of NAMF, although they were performing only government relations work. Sonntag, in his contract, "expressly agree[d] that his duties as an account executive include: (1) the *management* of trade associations, including public relations, membership relations, membership recruitment and customer service responsibilities ..." (emphasis added).[3] And, both Sonntag and Shaw's contracts state that they "agree to abide by all of the ethical principles, whether now in force or hereafter adopted, applicable to the

---

**3.** It is suggested—but only suggested—that government relations is somehow different from other management services because it is not set forth as one of Sonntag's managerial duties. Appellees would have us conclude that government relations is therefore not covered by the covenant. But the specifically enumerated functions in Sonntag's contract are not meant to be exclusive, and it would be impossible to conclude that public relations, which is listed, is more of a management function than is government relations—particularly for a trade association (they are actually closely intertwined).

trade association *management* profession" (emphasis added). It is undisputed that for some time, at least since 1973, Smith, Bucklin's management services offered to its clients have included government relations along with providing administrative, accounting, and personnel support. Appellees concede that at Smith, Bucklin "the business of management of any association may encompass *as part of its management* of the association, the management of government relations ..." (emphasis added). Moreover, if the parties had not viewed Sonntag and Shaw as engaged in "managing or advising on the management," the covenant in their employment contract would have had little effect because it would not have barred them from performing the same work for another company.

Appellees would have us look not to the exact work they are performing for NES and NAMF but rather only at the nature of the contract NES has with NAMF. If NES had the same contract with NAMF as did Smith, Bucklin, then Sonntag and Shaw seem to acknowledge that they would have violated the covenant. Or if Sonntag and Shaw had gone to work directly for NAMF, they would have presumably similarly violated its covenant because NAMF itself is certainly managing, in some sense, its own affairs. Essentially then, appellees would have us understand the covenant as barring employees from performing the same service for a competitor only if that service is part of a broader package offered by the competitor. We think that is an unreasonable interpretation of the plain language of this contract.[4]

■ To be sure, the district court partially relied upon its view that the covenant was a contract of adhesion in refusing to issue the injunction. However, the court misapplied the "contract of adhesion" doctrine. In *Riggs National Bank v. District of Columbia*, 581 A.2d 1229, 1251 (D.C.App.1990), the court explained that "a contract may be one of adhesion, and is therefore subject to judicial scrutiny for unconscionability. To establish unconscionability, however, the District

must prove not only that one of the parties lacked a meaningful choice but also that the terms of the contract are unreasonably favorable to the other party" (citation omitted). Assuming *arguendo* that the covenant is a contract of adhesion, the court must still decide whether the contract is unconscionable. The case relied upon in *Riggs National Bank* for its contract of adhesion analysis, *Perdue v. Crocker Nat'l Bank*, 38 Cal.3d 913, 216 Cal.Rptr. 345, 702 P.2d 503, 509 (1985), *appeal dismissed*, 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986) (quoting *Graham v. Scissor–Tail, Inc.*, 623 P.2d 165, 172 (1981)), makes this point explicit: "[t]o describe a contract as adhesive in character is not to indicate its legal effect ... [A] contract of adhesion is fully enforceable according to its terms unless certain other factors are present which, under established legal rules—legislative or judicial—operate to render it otherwise." The district court apparently thought the contract unconscionable because it violated District of Columbia public policy.

But the covenant plainly did not. Smith, Bucklin's value largely resides in its employees' expertise and the relationships they develop with Smith, Bucklin's clients. The covenant is a rather standard effort to prevent Smith, Bucklin's employees from capturing that full value themselves. Such covenants are perfectly legitimate under District of Columbia law so long as they are reasonably tailored. The District of Columbia Court of Appeals in *Ellis v. James V. Hurson Assoc., Inc.*, 565 A.2d 615, 620–21 (D.C.App.1989), addressing an analogous situation, explained that "prohibitions against the solicitation of customers known to the employee by virtue of his former employment are enforceable as reasonable restrictions.... As the trial court noted, agreements well in excess of three years have been sustained in this jurisdiction." The restriction at issue here similarly applies only to associations with which the employee came in contact while at Smith, Bucklin and the requested injunction would last for only 10 months. There is no reason

---

4. The extrinsic evidence Sonntag and Shaw rely on to support their interpretation, which includes the testimony of the President of NES as

to what the clause in his competitor's contract means, is not impressive.

to believe, as the district court did, that this restriction "effectively would [ ] put [Shaw] on the unemployment line." Shaw could continue to work serving NES' other clients. The President of NES testified that there was "plenty" of work for Sonntag and Shaw even if they were enjoined from working for NAMF.

The district court offered one last reason for not granting the preliminary injunction: Smith, Bucklin's own alleged breaches of the employment contracts. It does not appear however that Shaw was contractually entitled to more than the 5 days notice she was given. Her contract states that she may be terminated "effective as of the date [a termination] notice is deposited in the mails, and Employee's employment for all purposes shall cease on that date." In any event, Shaw cannot now complain that she was not given sufficient notice of her termination when she had already secretly accepted a job with NES several weeks before. Sonntag was entitled to severance pay, but Smith, Bucklin reasonably conditioned this payment upon compliance with the covenant not to compete because it had legitimate grounds for believing that Sonntag and Shaw had violated the prohibition on soliciting clients to leave (and there are strong reasons, as we have discussed, to conclude that they intended at the time of their termination to violate the prohibition on "managing or advising on the management" of former Smith, Bucklin clients). In short, these "equitable" considerations are not sufficient to deny preliminary injunctive relief.

 Whatever the soundness of the district court's reasoning, however, it was still necessary for Smith, Bucklin to demonstrate that it had satisfied the second prerequisite for a preliminary injunction—that Smith, Bucklin would suffer irreparable harm without it. *See Wieck*, 350 A.2d at 387. Smith, Bucklin points out that the NAMF's lost account generated approximately $600,000 in revenue annually. And, the effect of Sonntag and Shaw's actions on Smith, Bucklin's other business dealings with NAMF, AESF, and MFSA might be ruinous. But Smith, Bucklin has not adequately described these other business dealings nor explained how a preliminary injunction would help regain NAMF as a client or maintain any current dealings with NAMF. As Smith, Bucklin acknowledged at oral argument, whatever damage has been inflicted on its relationship with NAMF would likely remain unchanged by a preliminary injunction. Any damage that has occurred can be adequately compensated at law.[5] Although there is a contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminarily enjoined, this by itself is an insufficient prop. *See Ellis*, 565 A.2d at 619 n. 14.

Ironically, as became apparent at oral argument, appellant's only real ground for asserting irreparable injury is the effect that the district court's opinion—which casts substantial doubt on the enforceability of the covenant—will have on present employees. Since we do not affirm the district court's contract analysis and indeed, at least preliminarily, think appellant has a strong case on the merits, this "injury"—even if it were cognizable—is dissipated.

For the preceding reasons, the denial of Smith, Bucklin's request for a preliminary injunction is

*Affirmed.*

---

5. Moreover, in its complaint Smith, Bucklin requested a preliminary injunction that would run until June 30, 1996. At no point in the proceedings below, as far as we can tell, and certainly not in its brief before us has Smith, Bucklin argued that the 10–month period should run from the date the preliminary injunction is granted. If Smith, Bucklin has waived this "tolling" argument, *see Charter Oil Co. v. American Employers Ins. Co.*, 69 F.3d 1160, 1170–71 (D.C.Cir. 1995), then it seems that the usefulness of a preliminary injunction is rather inconsequential. Even assuming that an injunction were granted the very day this opinion issued, May 14, it would run only 47 days.