**22-1229-cv**
*JTH Tax d/b/a Liberty Tax Service v. Agnant*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2022

Argued: October 25, 2022     Decided: March 13, 2023

Docket No. 22-1229-cv

JTH TAX, LLC, D/B/A LIBERTY TAX SERVICE,

*Plaintiff-Appellant,*

— v. —

ALEXIA AGNANT, DEMETRESS CORPORATION,

*Defendants-Appellees.*

Before:

CABRANES, LYNCH, and ROBINSON, *Circuit Judges.*

Plaintiff-Appellant, a franchisor of tax preparation services, appeals from an order of the United States District Court for the Eastern District of New York (Pamela K. Chen, *J.*) denying its motion for preliminary injunctive relief to

enforce, among other things, covenants not to compete or solicit former clients against Defendants-Appellees, its former franchisees. On appeal, Appellant argues that the district court erroneously applied a heightened standard for obtaining preliminary injunctive relief, failed to credit an undisputed fact that Appellant had grounds to terminate the franchise agreements because Appellees were violating federal tax laws, and was compelled as a matter of law to find that it would suffer irreparable harm to its goodwill and client relationships in the absence of an injunction. We conclude that the district court applied the appropriate standard, permissibly credited Appellees' denials that they violated federal tax laws, and acted well within its discretion in concluding that Appellant would not suffer irreparable harm. We therefore AFFIRM the order denying preliminary relief.

---

MATTHEW B. NICHOLSON (Amy Mason Saharia, Kimberly Broecker, *on the brief*), Williams & Connolly LLP, Washington, DC, *for Plaintiff-Appellant*.

JAAZANIAH ASAHGUII (Alexander T. Coleman, Michael J. Borrelli, *on the brief*), Borrelli & Associates, P.L.L.C., Garden City, NY, *for Defendants-Appellees.*

---

GERARD E. LYNCH, *Circuit Judge*:

This is a franchise dispute between Plaintiff-Appellant franchisor JTH Tax, LLC, d/b/a/ Liberty Tax Service ("Liberty") and Defendants-Appellees Alexia Agnant and her wholly owned New York corporation, Demetress Corporation (together, "Agnant"). Agnant is a former Liberty franchisee. In March 2022, Liberty terminated her franchise agreements, claiming that Agnant and her staff

had committed material violations of federal tax laws and regulations in providing tax preparation services. In its termination notice, Liberty demanded that Agnant comply with various post-termination obligations, including her non-compete and non-solicitation covenants. Agnant refused, prompting Liberty to sue and move for preliminary injunctive relief in federal district court.

The district court (Pamela K. Chen, *J.*) granted a temporary restraining order but, after holding an evidentiary hearing, denied a preliminary injunction. At that hearing, Agnant – the only live witness – testified that she and her staff complied with federal law and that Liberty exaggerated her due diligence obligations under federal tax law. The district court credited that testimony over Liberty's competing declarations. Consequently, the court held that Liberty had failed to show a likelihood of success on the merits because it had not established a contractual basis to terminate the franchise agreements. Additionally, the court held that Liberty failed to show that it would suffer irreparable harm to its goodwill or client relationships in the absence of an injunction because it had presented no evidence of actual or imminent harm.

Finding no abuse of discretion, we AFFIRM the district court's decision.

# BACKGROUND

### I.   Factual Background

Liberty is a franchisor of income tax preparation services. In November 2019, Liberty and Agnant executed three materially identical franchise agreements, authorizing Agnant to operate four preexisting franchise locations in Brooklyn, New York, under Liberty's banner.

Before the parties had executed the franchise agreements, Liberty had been investigated by the Department of Justice ("DOJ") and the Internal Revenue Service ("IRS"). As a result of that investigation, the United States filed a civil action against Liberty on December 3, 2019. The complaint charged that various Liberty franchisees had prepared false or unsupported tax returns that inflated their clients' earned income tax credit ("EITC"), a refundable tax credit for low- and moderate-income workers with child dependents. The EITC program provides a credit based on a percentage of the filer's earned income, unless the filer's income exceeds a statutory limit, which is set based on the filer's number of child dependents and joint or single filing status. *See* 26 U.S.C. § 32(b)(1)-(2). Filers can fraudulently inflate their EITC in several ways: they can claim non-existent child dependents; they can understate their earned income to avoid the

4

EITC's earned income limits; or they can *overstate* their earned income if, as sometimes happens, the increase in the EITC exceeds the increase in their federal income tax obligations on their exaggerated income.

The United States's complaint against Liberty focused on its franchisees' practice of reporting fictitious business income on Schedule C to IRS Form 1040. Because Schedule C filers operate as sole proprietors, the IRS does not receive independent verification of their income from an employer. Thus, absent an audit, the IRS must rely on accurate reporting from the filers and their tax preparers. For that reason, a falsified Schedule C provides a more "practical" vehicle for EITC fraud than, say, an employee misstating wages, which the IRS can "easily detect[]" as soon as it does not "find a corresponding W-2 wage statement filed with the employer's annual W-3 filing." Stanley Veliotis, *Fictitiously Overstating Taxable Income*, 55 U.S.F. L. REV. 205, 210 n.33 (2021).

On December 20, 2019, Liberty and the United States entered into a consent decree. The consent decree in relevant part required Liberty to identify and report to an independent monitor any franchisee who should be terminated for violating federal tax law or for failing to maintain adequate controls to ensure accurate reporting to the IRS.

As part of its compliance efforts, Liberty audited one of Agnant's franchise locations on July 22, 2021. Based on its review, Liberty required Agnant to take training courses and to perform so-called "Client File Remediation." Joint Appendix (J.A.) 2143. To complete client file remediation, Liberty required Agnant to obtain additional support for allegedly insufficiently documented returns or, if necessary, to recommend that the client file an amended return. On September 1, 2021, based on the same audit, Liberty issued a "Notice to Cure" Agnant's alleged failure to obtain and preserve documentation supporting claims made in various clients' Schedule C filings. *Id.* at 2144**.** The notice to cure did not specify what supporting documentation Agnant needed but did not have. Instead, it generically advised that:

> When preparing a Schedule C, you must immediately begin performing proper due diligence in both the interview portion and documents kept on hand. All support provided by the taxpayer must be kept on file, and documents in the file must match what is reported on the Schedule C. Additionally, support for business existence is required for every tax return with a Schedule C.

*Id.* "To address this notice," Liberty required Agnant "to develop a Remediation Plan detailing the steps that will be taken to ensure [that] due diligence is being

6

performed in [Agnant's] offices." *Id.* Agnant timely completed the training courses, client file remediation, and remediation plan. On September 15, 2021, Liberty notified Agnant that "[a]ll requirements of this issue have been met and we are closing this issue at this time." *Id.* at 2146.

Nonetheless, Agnant remained bound by her remediation plan. In fact, Liberty later extended that plan to all Agnant's locations. The plan required Agnant's locations to have a second preparer review all Schedule C returns and then upload the returns and their supporting documentation to Liberty's internal system. Liberty also added a condition that, "[f]or every Schedule C return submitted" through one of Agnant's locations, Liberty's Compliance Department "will review the return before it can be submitted to the IRS." *Id.* at 2135. At some point, it seems, that condition was extended to all Agnant's locations.

On February 15, 2022, Liberty reviewed uploaded returns for one of Agnant's locations. Based on that review, Liberty notified Agnant on February 21, 2022, that she must complete additional training courses entitled "2021 Dependent Review Course" and "2021 Common Schedule C Errors." *Id.* at 2124. Liberty also required Agnant to complete "Client File Reconciliation," which appears to have required the same actions as client file remediation. *Id.* at 2125.

7

Three days later, Liberty issued a second notice to cure, claiming that its review had revealed that one of Agnant's locations failed to obtain supporting documentation for returns, "including, when necessary, [d]ocumentation for Schedule Cs." *Id.* at 2127. Like the first notice, the second notice did not specify what supporting documentation she and her staff were supposed to obtain or upload. It simply offered the same generic advice as the first notice. That same day, Liberty issued a "Notice of Default" for

> • Failure to Implement a Required Remediation Plan and Perform Due Diligence in the Preparation of Tax Returns
>
> Your approved remediation plan required every preparer working in all of your offices to complete additional Schedule C training. This plan also requires every return prepared in your offices to be reviewed by someone other than the tax preparer prior to submission using the Tax Return Review Checklist. You must immediately implement your remediation plan ensuring [that] no tax preparer hired to work in your offices completes a Schedule C return until after training completion and that every return prepared is reviewed before it is submitted.

*Id.* at 2127-28.

On March 12, 2022, Liberty sent Agnant a letter notifying her that it was terminating the franchise agreements pursuant to § 8(b)(iii) of those agreements.

8

As relevant here, that provision authorized Liberty to terminate the franchise agreements, without giving Agnant prior notice or an opportunity to cure, if it found that she or her staff "committed a material violation of any law, ordinance, rule or regulation" in preparing tax returns. *Id.* at 53-54. Liberty also demanded that Agnant comply with her post-termination obligations under §§ 9 and 10 of the franchise agreements. Those provisions required Agnant to refrain from identifying herself as a franchisee of Liberty or using Liberty's marks; transfer all phone numbers and email accounts of her locations to Liberty; assign to Liberty upon its request any lease interest that she might have had in the franchise locations; deliver all paper and electronic copies of customer lists, tax returns, files, and records; and comply with her non-compete and non-solicitation covenants. The non-compete covenant prohibited Agnant, for a two-year period following termination of the agreements, from preparing income tax returns for profit within twenty-five miles of the boundaries of her former geographic territories. Her geographic territories extended several city blocks around her Brooklyn locations and were specifically demarcated in Schedule A of the franchise agreements. The non-solicitation covenant forbade Agnant, for the same two-year period, from soliciting any client that she had served within

9

twelve months prior to termination.

Agnant acknowledges that she has not complied with either covenant. Nor has she transferred the phone numbers, email accounts, or lease interests of the Brooklyn locations. She testified that she has, however, stopped marketing her services using Liberty's name or marks – she now appears to operate as Rocket Tax – and has stopped using its proprietary information, such as its forms.

## II.    Procedural History

### A.    Agnant's Prior Complaint

On April 25, 2022, Agnant sued Liberty, asserting claims for violation of the New York Franchise Sales Act, fraud in the inducement, and unjust enrichment. In her verified complaint, Agnant claimed that Liberty committed fraud by failing to advise her of the DOJ and IRS investigation and the resulting consent decree. She also disputed Liberty's basis for terminating the franchise agreements. In particular, she denied violating federal tax laws or regulations and alleged that Liberty's notices to cure lacked specificity regarding the alleged violations and guidance as to what Liberty believed was required to comply with federal law. She alleged that Liberty had issued the notices to cure and the notice of default in order to manufacture a basis to terminate the franchise agreements.

Finally, she claimed that Liberty unjustifiably withheld more than $1 million in tax preparation fees due to her until she complied with her post-termination obligations.

### B. Liberty's Complaint

The following day, Liberty sued Agnant in this separate action, which the district court consolidated with Agnant's action against Liberty. In its verified complaint, Liberty asserted the following eight counts: (1) an equitable claim for breach of the franchise agreements; (2) a monetary claim for breach of the franchise agreements; (3) violation of the Defend Trade Secrets Act of 2016; (4) trademark infringement in violation of 15 U.S.C. § 1114(1); (5) false designation and misrepresentation of origin under 15 U.S.C. § 1125(a); (6) federal trademark dilution under 15 U.S.C. § 1125(c); (7) unjust enrichment; and (8) common-law conversion. Liberty alleged that it "terminated the Franchise Agreements after it discovered that [Agnant] had been improperly filing federal tax returns" and that her "actions violated federal law and regulations." J.A. 12. Liberty alleged that Agnant failed to comply with her non-compete and non-solicitation covenants. Finally, Liberty alleged that Agnant continued to use Liberty's marks and confidential information, including its operations manual

11

and client information and files.

Liberty also moved for a temporary restraining order and preliminary injunctive relief, seeking to enforce Agnant's post-termination obligations. On May 2, 2022, the district court entered a temporary restraining order compelling Agnant not to compete or solicit; not to use Liberty's marks, confidential information, or trade secrets; and to preserve all lease interests and telephone numbers associated with the Brooklyn locations. The district court scheduled an evidentiary hearing for May 13, 2022.

The hearing principally concerned whether Liberty had a basis to terminate the franchise agreements. On that issue, Liberty had submitted a declaration of its Vice President Compliance Counsel, David Dulaney, in which Dulaney attested that "Liberty repeatedly notified Agnant that she was not properly preparing Schedule C's in support of her clients' Federal Income Tax returns, and she did not rectify the deficiencies." D. Ct. Dkt. No. 15-1, ¶ 8.

In contrast, Agnant – the only live witness at the hearing – testified that Liberty reviewed all her locations' returns and submitted those returns to the IRS, which accepted them without incident. She testified that "Liberty would pick on little things," J.A. 392, and that Liberty was unhelpful when she asked what she

12

or her staff were doing wrong. On the latter point, she also submitted to the district court some of her communications with Liberty, as described above, regarding the notices to cure. She admitted, however, that some returns "were missing a document or two, like an ID[,] or needed an extra receipt or explanation," but maintained that, once advised to correct something of that nature, she "would quickly and efficiently" correct it. *Id.* at 426.

During the hearing, Liberty's counsel noted the competing accounts of Dulaney and Agnant, and he urged the district court to credit Dulaney:

> Basically, what she's asking is, "You should believe me rather than the head of compliance and the verified complaint," which is verified, you know, by a fairly high-ranking executive at Liberty. And she's asking you to say that they're wrong, notwithstanding that the head of compliance is specially trained in this, notwithstanding that [Agnant's] complaint is truly replete with statements that are demonstrably inaccurate.

*Id.* at 359. The district court noted, however, that Liberty had yet to specify to Agnant or submit to the court "the returns that [it found] don't comply with the requirements of the law or of the franchise agreement[s]." *Id.* at 360.

After the hearing, Liberty submitted a supplemental declaration of Dulaney. Dulaney offered seven examples of Agnant's alleged failures, two of

13

which concerned Schedule C returns. For those returns, Dulaney alleged that Agnant claimed that the filer was eligible for the EITC but did so without "proof of business existence." *Id.* at 2155-56. For one of the Schedule C returns, Dulaney also alleged that Agnant reported income that was inconsistent with her interview notes, which "show that the taxpayer charges $150/wk for customers." *Id.* Those returns, according to Dulaney, violated 26 U.S.C. § 6694, which penalizes tax preparers for preparing returns that cause the taxpayer to understate their federal income tax liability. Dulaney also attached to his supplemental declaration an audit report for two of Agnant's locations. The audit report noted, for example, that Liberty had found error rates as high as 57% for one of Agnant's locations in February 2021.

On May 17, 2022, the district court denied Liberty's motion. The court held that Liberty was required to show a clear or substantial likelihood of success on the merits, and make a strong showing of irreparable harm, for two reasons: first, because its requested injunction was mandatory, and second, because the injunction would provide Liberty with all the relief it seeks in the action and cannot be undone if Agnant later prevails at trial on the merits. The court found that Liberty had failed to make the heightened showing. Alternatively, the court

found that Liberty would not be entitled to injunctive relief even under the ordinary standard for a preliminary injunction, which requires the movant to show a likelihood of success on the merits and a likelihood of irreparable harm.

As for the merits, the court credited Agnant's testimony and evidentiary submissions, explaining that they "neutralize[d]" Dulaney's declarations. Special Appendix (S.A.) 25. On that basis, the court held that Liberty had failed to make a strong showing that it had grounds to terminate the franchise agreements, and therefore that it failed to show it was likely to succeed on the merits in this case. Separately, the court held that Liberty had failed to show that it would suffer irreparable harm. Agnant, the court explained, had abated her use of Liberty's marks and confidential information. And Liberty had submitted no evidence that Agnant's continued operation of a competing tax business would harm Liberty's goodwill or reputation, or cause it permanently to lose customers. Liberty appeals from that decision.

## DISCUSSION

Liberty argues that the district court erred in imposing a heightened standard for obtaining preliminary injunctive relief, that the court abused its discretion in holding that Liberty failed to show that it had a contractual basis to

terminate the franchise agreements, and that the court abused its discretion in

holding that Liberty failed to show irreparable harm. We consider, and reject,

each of those arguments in turn.

### I.      Standard of Review

We have appellate jurisdiction over a denial of a motion for preliminary

injunctive relief pursuant to 28 U.S.C. § 1292(a)(1). "[W]e review a district court's

decision on a motion for preliminary injunction for abuse of discretion." *Zervos v.*

*Verizon New York, Inc.*, 252 F.3d 163, 167 (2d Cir. 2001). A district court abuses – or

more precisely, exceeds – its discretion when its decision rests on an "error of

law" or a "clearly erroneous factual finding," or "cannot be located within the

range of permissible decisions." *Id.* at 169.[1] When the district court's disposition

---

[1] "The word 'abuse' in the 'abuse of discretion' standard is an unfortunate – and inaccurate – term of art." *In re The City of New York*, 607 F.3d 923, 943 n.21 (2d Cir. 2010); *see also United States v. Bove,* 888 F.3d 606, 607 n.1 (2d Cir. 2018). That is because the term "abuse" simply describes circumstances where a district court commits an error of law – a "quite common and unavoidable [occurrence] in a system of adjudication" – or takes a clearly erroneous assessment of the evidence or renders a decision outside the range of reasonable ones – which is an unquestionably "serious matter," but not one that involves "'abuse' in the ordinary sense of the word." *In re City of New York*, 607 F.3d at 943 n.21; *see also United States v. Ghailani*, 733 F.3d 29, 44 (2d Cir. 2013). Thus, the word "'exceeded' [is] both a more felicitous and correct term." *Zervos*, 252 F.3d at 169 n.6 (2d Cir. 2001), quoting *Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 974 (2d Cir. 1987).

involves an assessment of witness credibility, that assessment is entitled to "special deference." *Repp v. Webber*, 132 F.3d 882, 891 (2d Cir. 1997), quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985).

## II. The District Court Applied the Correct Standard for Issuing a Preliminary Injunction.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

In at least two circumstances, a plaintiff seeking a preliminary injunction must satisfy a heightened standard by "show[ing] a clear or substantial likelihood of success on the merits, and [by] mak[ing] a strong showing of irreparable harm." *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks and citations omitted). First, a plaintiff must meet that standard if he seeks an injunction that provides him substantially all the relief he seeks in the litigation, and that cannot be meaningfully undone in the event that the enjoined party prevails at trial on the

17

merits. *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34-35 (2d Cir. 1995). "The policy against the imposition of judicial restraints prior to an adjudication of the merits becomes more significant when there is reason to believe that the decree will be burdensome." 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.2 (3d ed. April 2022 Update) (hereinafter Wright & Miller). Second, a plaintiff must meet that standard if he seeks a so-called "mandatory injunction" – that is, an injunction that "alter[s] the status quo," which usually is done by "commanding some positive act." *Tom Doherty*, 60 F.3d at 34. A heightened standard is imposed in such circumstances, in part, because injunctions of those sorts tend to be particularly burdensome to the defendants subject to them. *See* Wright & Miller § 2948.2.

The district court found that Liberty's requested injunction satisfied both grounds for applying the heightened standard. Because we agree that Liberty's requested injunction satisfied the first ground, we need not address the second.

Liberty argues that the district court erred in finding that the first ground applied here because that ground applies only where, unlike here, "the effect of the [proposed injunctive] order, once complied with, cannot be undone." Liberty Br. 28 n.2, quoting *Tom Doherty*, 60 F.3d at 35. But Liberty does not explain, nor

can we divine, how a court could undo the effect of a wrongfully imposed

injunction that would effectively put Agnant out of business.

When determining whether to apply the heightened standard on this

ground, we look to whether "the effect of the order, once complied with, can[] be

undone." *Tom Doherty*, 60 F.3d at 35. Put another way, the heightened standard

applies "if a preliminary injunction will make it difficult or impossible to render a

*meaningful remedy* to a defendant who prevails on the merits at trial." *Id.*

(emphasis added).

In this context, our precedents decisively support the district court's view

that it could not provide Agnant with a meaningful remedy if she were

erroneously forced to close her locations.[2] In *Semmes Motors, Inc. v. Ford Motor Co.*,

for example, we held that a family-owned car dealership would be irreparably

injured by wrongful termination of its franchise agreement. 429 F.2d 1197, 1205

(2d Cir. 1970). Termination would "obliterate[]" the business and, we

---

[2] To be sure, the district court did not explicitly state in its opinion that Agnant would suffer irreparably. But that finding is implicit in the district court's decision, which recited the correct legal standard and found that Liberty's requested injunction satisfied it. Moreover, at the hearing, the district court had stated that Liberty's zealous enforcement of its consent decree with the United States has a "greater impact on the individual franchisees" and "would . . . basically put [Agnant] out of business." J.A. 369-70.

emphasized, "the right to continue a business . . . is not measurable entirely in monetary terms," especially when that business is essential to the defendant's manner of living. *Id.* ("[A] 'judgment for damages acquired years after his franchise has been taken away and his business obliterated is [a] small consolation to one who, as here, has had a Ford franchise' for many years." (quoting *Bateman v. Ford Motor Co.*, 302 F.2d 63, 66 (3d Cir. 1962))). Likewise, in *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York*, we held that a closure of a family-owned business could not "be fully compensated by subsequent monetary damages" because the "ongoing business represent[ed] many years of effort and the livelihood of its husband and wife owners." 749 F.2d 124, 125-26 (2d Cir. 1984).[3] Thus, under these circumstances we have found irreparable harm where "the very viability of the plaintiff's business" is "threatened." *Tom Doherty*, 60 F.3d at 38.

Like the family-owned businesses in those cases, Agnant would suffer

---

[3] *See also Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 n.3 (2d Cir. 1987) (noting with approval a district court's observation that the "threat" of "put[ting] [the] plaintiff out of business" "would clearly constitute irreparable harm"); Wright & Miller § 2948.1 (collecting cases that have found irreparable harm "when the potential economic loss is so great as to threaten the existence of the moving party's business").

20

irreparable harm if she were wrongfully put out of business. At the hearing, Agnant testified that she used her home as collateral for a loan to open her business and that, if her business were closed, she would be unable to provide for her family. Her counsel explained, too, that she needed to continue operating her business in order to have the funds necessary to defend herself against Liberty. Moreover, Agnant had been in business only for some two years before Liberty moved to enjoin her. *See Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 436 (2d Cir. 1993) (holding that the "threat[]" to the "continued existence" of a "two-year-old dealership" that had "began to show a profit" only within the last year was irreparable especially because "[c]alculation of . . . lost profits would be highly speculative"). This is not a case in which Agnant had an established presence or long history of operations in the geographic area, from which a court could easily "extrapolate damages." *See Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (acknowledging that the "threat to the continued existence of a business can constitute irreparable injury," but holding that the district court did not exceed its discretion in finding that the defendants' "long history of operation" allowed them to "extrapolate damages" if they were temporarily shut down). Notably, Liberty has not endeavored to explain how, if

at all, a court could grant Agnant a meaningful remedy if she were wrongfully forced to close.[4]

Accordingly, the district court appropriately applied the heightened standard because Liberty sought an injunction that would provide it with substantially all the relief that it seeks in the litigation, and because that injunction could not meaningfully be remedied in the event that Agnant prevails on the merits.

### III. The District Court Did Not Exceed its Discretion in Concluding that Liberty Failed to Meet that Standard.

Under the heightened standard, Liberty must "show a clear or substantial likelihood of success on the merits, and make a strong showing of irreparable harm." *See Schneiderman*, 787 F.3d at 650 (internal quotation marks and citations omitted). We find no abuse of discretion in the district court's holding that Liberty failed to make those showings.[5]

---

[4] We do not suggest that only small businesses can suffer irreparable harm when forced to close. The principles that we described above have been applied to larger businesses, too. *See Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 423 (2d Cir. 2013) (operators of a nuclear power plant). Notwithstanding, Agnant's particular circumstances makes this an easier issue.

[5] The district court held that Liberty was not entitled to injunctive relief even under the ordinary standard. We need not reach that question.

22

*A.    Likelihood of Success*

The district court held that Liberty failed to show that it had grounds to terminate the franchise agreements. Liberty terminated the franchise agreements pursuant to its authority under § 8(b)(iii) of those agreements. Under that section, Liberty could terminate the franchise agreements, "without notice and the opportunity to cure,"

> if we determine that you, or someone acting under your supervision and control, has committed a material violation of any law, ordinance, rule or regulation of a governmental agency or department reasonably associated with the operation of the Franchised Business . . . .

J.A. 53-54.[6]

In support of its claim that Agnant committed material violations of federal tax law, Liberty submitted the two Dulaney declarations. In his first declaration, Dulaney alleged that "Liberty repeatedly notified Agnant that she was not properly preparing Schedule C's in support of her clients' Federal Income Tax returns, and she did not rectify the deficiencies." D. Ct. Dkt. No. 15-1, ¶ 8. In his

---

[6] The franchise agreements provided for other grounds on which Liberty could terminate the franchises. In seeking preliminary relief, however, Liberty relied on the "material violation of any law" provision. J.A. 53-54.

supplemental declaration, he offered seven examples of Agnant's alleged errors, including two Schedule C errors. Both Schedule C errors involved her alleged failure to obtain "proof of business existence" supporting the filer's claim for the EITC. J.A. 2155-56. One of the errors additionally involved Agnant allegedly misstating the filer's income. Dulaney also submitted an audit report asserting error rates as high as 57% for one of Agnant's locations.

The district court explained that, if credited, the facts alleged in Dulaney's declarations would have justified Liberty terminating the franchise agreements on the basis that Agnant committed a material violation of federal tax law. Indeed, Dulaney accuses Agnant, like Liberty franchisees of the past, of understating her clients' federal tax liability and of failing to follow federal due diligence requirements. That conduct, if true, could expose Agnant to civil penalties, *see* 26 U.S.C. §§ 6694(b) (understating federal tax liability), 6695(g)(2) (failing to comply with due diligence regulations), and possible criminal prosecution, depending on her state of mind, *see, e.g.*, 26 U.S.C. §§ 7201 (attempting to evade or defeat tax), 7206(2) (aiding or assisting fraudulent and false statement in tax returns), 7207 (filing fraudulent returns, statements, or other documents); 18 U.S.C. § 286 (engaging in a conspiracy to defraud the

24

United States with respect to claims). And, in light of the consent decree with the United States, Liberty could not ignore such conduct.

The district court, however, credited Agnant's evidence and competing testimony, finding that it "neutralize[d]" Dulaney's allegations. S.A. 25. In her verified complaint, Agnant claimed that neither she nor her staff violated federal tax laws. And she in effect renewed that claim in her live testimony. She explained that "Liberty would pick on little things." J.A. 392. For example, Liberty apparently demanded that Agnant gather "school letter[s]" showing that children were in school, during a time when "schools [we]re shut down" and students were in periods of remote learning due to the COVID-19 pandemic. *Id.* Agnant also testified that Liberty "reviewed [the returns] first before [it] submitted [those returns] to the IRS," something that Liberty would not have done "if they weren't good to go." *Id.* at 400. Agnant testified that the "IRS accepted [her] returns" without incident. *Id.* at 402. "The returns are fine," she insisted. *Id.*

Agnant also suggested that Liberty imposed requirements on her that went above the demands of federal law. For example, she testified that it was "puzzling" that Liberty asked for additional information, and that Liberty's

requests seemed to be geared at "training" her to help her succeed as a tax preparer, rather than documenting or correcting allegedly unlawful returns. *Id.* at 400-01. Moreover, as found by the district court, and not disputed by Liberty on appeal, Liberty's pre-termination communications with Agnant lacked specificity as to what exactly she was doing wrong. Liberty consistently offered her only boilerplate and non-specific guidance, both when initially noticing Agnant of her alleged missteps, and even after she requested further clarity. The district court reasonably found that Liberty's lack of specificity bolstered Agnant's testimony that she had done nothing wrong.[7]

The district court's decision to credit Agnant over Dulaney effectively decides this case. Our review for "clear error . . . sharply limits the extent to which we may second-guess the district court's determinations with respect to witness credibility." *Locurto v. Giuliani*, 447 F.3d 159, 176 (2d Cir. 2006). Whether to credit one witness over the other is entirely "within the province of the district court as the trier of fact." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d

---

[7] Liberty argues that the district court, by noting that Liberty gave Agnant non-specific and boilerplate responses, read into the franchise agreements a non-existent opportunity to cure. The district court did no such thing. Instead, the district court simply found that Liberty's lack of specificity bolstered Agnant's testimony that she had not filed materially inaccurate returns.

26

42, 52 (2d Cir. 2011). That is because "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *United States v. Isiofia*, 370 F.3d 226, 232 (2d Cir. 2004), quoting *Anderson*, 470 U.S. at 575. Accordingly, a trial judge's credibility determinations are entitled to "special deference." *Repp*, 132 F.3d at 891, quoting *Anderson*, 470 U.S. at 574; *see also Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 64 (2d Cir. 1992) ("We owe particularly strong deference where the district court premises its findings on credibility determinations.").

To be sure, a trial judge might exceed its discretion by baldly crediting a witness's account that is "implausible on its face" or irreconcilable with "reliable extrinsic evidence." *Anderson*, 470 U.S. at 579; *see also Castrol, Inc.*, 977 F.2d at 64. When those circumstances are not present, however, a trial judge is entitled "to credit the testimony of one of two or more witnesses," and its doing so "can virtually never be clear error." *Castrol, Inc.*, 977 F.2d at 64, quoting *Anderson*, 470 U.S. at 575. A trial judge "is also entitled, just as jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." *Diesel Props S.r.l.*, 631 F.3d at 52 (citations omitted).

Here, in light of the strong deference we accord to a trial judge's credibility

determinations, we cannot find that the district court committed clear error. For starters, Dulaney's first declaration was conclusory. It provided not one example of a tax return prepared by Agnant that violated federal law. As the district court pointed out at the hearing, Liberty failed to submit a single return prepared by Agnant that violated the "requirements of the law or of the franchise agreement." J.A. 360. After the hearing, Liberty submitted Dulaney's supplemental declaration. The district court expressed concern about this last-minute submission, explaining that "[i]t is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden." S.A. 21 n.19, quoting *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010). Regardless, like the first declaration, the supplemental declaration did not identify a single specific return with supporting evidence establishing that the return was in fact materially inaccurate. While Liberty's evidentiary burden did not require it to submit such a return as a matter of law, Liberty's choice to rely solely on Dulaney's out-of-court statements ran the risk that the district court might consider the absence of such evidence in weighing whether to credit Agnant over Dulaney as a matter of fact. And that

28

course of action was especially risky because Liberty was required under our precedents to show a clear or substantial likelihood of success on the merits. *See Schneiderman*, 787 F.3d at 650.

Liberty seems to suggest that the district court misunderstood Agnant's testimony. It argues that Agnant conceded that she and her staff violated federal law. In particular, it points to Agnant's testimony that "some [tax returns] were prepared correctly" while "[o]thers, as I said[] earlier[,] were missing a document or two," which "I would quickly and efficiently have . . . ready for them and submit it" once notified. J.A. 426. Understood in their proper context, however, nothing in those statements compelled the district judge – who heard Agnant's demeanor and tone of voice – to understand Agnant's testimony as a concession that she had committed a "material violation of any law." J.A. 53-54. A trial judge's discretion in assessing credibility extends to "the [trial judge's] understanding of and belief in what is said." *Isiofia*, 370 F.3d at 232, quoting *Anderson*, 470 U.S. at 575. And the district court had a basis for understanding Agnant to deny the facts alleged in Dulaney's declarations. In her verified complaint, Agnant took the position that Liberty had no basis to terminate the franchise agreements, and she denied violating federal tax law, claiming that she

had "complied with all federal, state and local laws with regard to obtaining supporting information or documentation for the preparation of Schedule C[]" tax returns. Verified Compl. ¶ 40, No. 22-2352 (E.D.N.Y. Apr. 25, 2022), Dkt. No. 1. While Agnant's denials were as conclusory as Dulaney's accusations, it was Liberty's burden to show that it properly terminated the franchise agreements.

Because the district court did not commit clear error in crediting Agnant's testimony, it did not exceed its discretion in finding that Liberty failed to make a clear or substantial showing of a likelihood of success on the merits. In reaching that conclusion, we do not imply that the judge was required to make this finding.[8] Other judges might well have made a different judgment. Nor do we suggest that the district court will or should reach a similar conclusion following a trial on the merits, when the parties' evidentiary showings will likely be more

---

[8] Nor do we suggest that the district court could not have found in Liberty's favor had it asserted an alternative basis for terminating the franchise agreement. In particular, § 8(b)(iii) of the franchise agreements authorized Liberty to terminate the agreements if Agnant "committed any act that is or could be, in Liberty's determination, harmful, prejudicial or injurious to the Liberty brand." J.A. 54. That standard seems to grant Liberty some level of discretion, and its invocation does not require a finding that Agnant violated the law. Liberty, however, did not invoke that basis for termination in seeking preliminary relief.

extensive, more thorough, and more carefully prepared. We conclude only that, on *this* record, after a limited hearing on an application for preliminary relief, the district court did not clearly err in its credibility finding, or exceed its discretion in concluding that Liberty had not clearly established a likelihood of success on the merits.

### B.    Irreparable Harm

Nor did the district court exceed its discretion in holding that Liberty failed to make a strong showing of irreparable harm.

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009), quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). That is because a preliminary injunction strives to maintain the status quo in order "to protect [the] plaintiff from irreparable injury" while awaiting final decision on the merits. Wright & Miller § 2947. To satisfy their burden to show irreparable harm, "[p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations,*

*Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted), quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).

The district court found that Liberty presented no evidence that Agnant's continuing operations would irreparably harm its goodwill, client relationships, or ability to compete in the geographic area. The court found that Agnant was no longer using Liberty's name, confidential information, or proprietary information and resources. And the court further explained that Dulaney's declarations did not speak to whether Liberty would suffer irreparable harm.

Liberty hardly disputes that modest evidence-based ruling. Instead, it argues that the district court lacked discretion to find that it would not suffer irreparable harm, because as a matter of law non-compete and non-solicitation covenants protect interests that are generally difficult to quantify. According to Liberty, our precedents recognize a "general rule" that a breach of those covenants automatically compels a finding of irreparable harm. Liberty Br. 31.

It is true that non-compete and non-solicitation covenants strive to protect various difficult-to-quantify interests. *See Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, 468 F. App'x 43, 46 (2d Cir. 2012) (summary order). For example, such covenants may protect a franchisor's institutional know-how,

reputation, goodwill, and client relationships – interests that "[g]enerally" are not easily redressable through an award of monetary damages. *Id.*, quoting *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp.2d 525, 532 (S.D.N.Y. 2004) (collecting cases). Indeed, we have said, "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999). And we have also said that "a loss of prospective goodwill that is both imminent and non-quantifiable can constitute irreparable injury." *Tom Doherty*, 60 F.3d at 38. Courts around the country share those views. *See* Wright & Miller § 2948.1 (collecting cases that have found that a "loss of goodwill . . . supports a finding of irreparable injury in cases in which employers seek to enforce restrictive covenants against their former employees to prevent them from contacting their customers").

However, "[t]hough courts often issue preliminary injunctions when it appears likely that the plaintiff will prevail in covenant-not-to-compete cases, this is not an automatic process, but instead depends upon the factual particulars in each case." *Baker's Aid, Inc. v. Hussmann Foodservice Co.*, 830 F.2d 13, 15

(2d Cir. 1987). There is thus no "automatic assumption" that "irreparable harm must inevitably be assumed in breach of covenant cases." *Id.*; *see also Tom Doherty*, 60 F.3d at 38 (outlining a fact-intensive set of circumstances under which the prospect of irreparable harm to a business's goodwill is present or lacking). Thus, in *Baker's Aid*, we were "loath to find an abuse of discretion . . . given the district court's factual findings and plaintiff's failure to produce any evidence of irreparable harm." 830 F.2d at 16. In a less analogous situation, we more recently held in *Dexter 345* that a district court did not exceed its discretion in holding that two hotel operators would not suffer irreparable harm from their inevitable shutdown, in part because "[t]hey have adduced nothing more than conclusory assertions in support of" their claims that they would be "unable to obtain new customers or reestablish relationships with travel promoters." 663 F.3d at 64. We also rejected their claim that they would suffer irreparable harm to their goodwill, because they had a "long history of operation" and an "established business" from which a court could "extrapolate damages." *Id.* at 63.

Accordingly, nothing in our precedents compels a district court to find irreparable harm to goodwill and client relationships in covenant-not-to-compete or -solicit cases simply because irreparable harm is often found in such cases.

34

Instead, a plaintiff must present the district court with actual evidence – as Agnant did through her testimony, with respect to her claim that *she* would suffer irreparable injury if a preliminary injunction were issued in error – that the plaintiff "will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd.*, 481 F.3d at 66 (internal quotation marks and citation omitted). A plaintiff is especially bound to do so where, as here, the plaintiff must make a strong showing of irreparable harm. *See Schneiderman*, 787 F.3d at 650.

On this score, all Liberty can cite is § 10(c) of the franchise agreements, in which Agnant "acknowledge[d] that any breach of the covenants not to compete causes damage to the integrity of Liberty's franchised system, loss of franchisee and customer goodwill and irreparable harm." J.A. 57. However, while such clauses may be entitled to weight, *Ticor Title Ins. Co.*, 173 F.3d at 69, they "do[] not control the question whether preliminary injunctive relief is appropriate," even in a case involving breach of a non-compete covenant. *Baker's Aid*, 830 F.2d at 16; *see also Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1130 (9th Cir. 2020); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263, 1266 (10th Cir. 2004);

35

*Smith, Bucklin & Assocs., Inc. v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996).

Finally, Liberty quibbles with various remarks that the district court made in arriving at its conclusion that Liberty submitted no evidence that it would suffer irreparable harm. For example, Liberty charges that the district court "blamed" it for failing to offer evidence of an immediate plan either to open new stores in the region or to have a new franchisee take over the old locations. Liberty Br. 36. By blaming it for that failure, Liberty argues, the district court "imposed . . . a legally incorrect and virtually insurmountable standard for irreparable harm." *Id.* The district court, however, imposed no such standard. Instead, the district court offered that example as one of the many reasons that Liberty's claim of irreparable injury was speculative on the record that Liberty presented to it. At bottom, the district court's ruling was specific and rooted in the evidentiary record: that Liberty "offer[ed] no evidence to support [its] overblown claim" of irreparable harm. S.A. 22. On that record, we cannot conclude that the district court's finding that Liberty had failed to make a strong showing of irreparable injury represented clear error or exceeded the court's discretion.

**CONCLUSION**

For the reasons set forth above, we AFFIRM the district court's order denying Liberty's motion for a preliminary injunction.